EUGENE KELLEY *v.* EDITH GENEVIEVE KELLEY

[No. 51, April Term, 1940.]

*Decided May 23rd, 1940.*

The cause was argued before OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Albert A. Doub* and *Albert A. Doub, Jr.,* for the appellant.

*Harold E. Naughton* and *Clarence Lippel,* for the appellee.

JOHNSON, J., delivered the opinion of the Court.

This is an appeal from a decree passed by the Circuit Court for Allegany County, dismissing appellant's amended bill of complaint, which, by leave, of the chancellor, was filed after testimony had been taken on behalf of the parties in open court.

The amended bill sought a decree that Edith Genevieve Kelley, the appellee, reconvey unto Eugene A. Kelley, appellant and plaintiff below, a certain parcel of real estate located in Cumberland, Maryland, and improved by a double brick dwelling known as Nos. 211 and 213 Pennsylvania Avenue, upon the ground that appellant had caused title to said real estate to be placed in the name of appellee, and that the conveyance was made upon an oral understanding or condition that she reconvey the property to him on demand after he had secured a decree of divorce from his wife, between whom and the appellant serious domestic differences had previously arisen and were then pending.

Appellee resisted the bill, contending that the property was by appellant given to her in consideration of the natural love and affection which appellant, who was her uncle, had for her, and in the further consideration that she was to pay off an existing mortgage against it in favor of Mary Clark Roman in excess of $3,500, executed by appellant and his wife; that she did assume that obligation and paid it off through another mortgage which she had obtained upon the property and bound herself to pay; further, that it was understood between her and appellant at the time she accepted the conveyance that he should have the right, so long as he desired, to live in one side of the double houses, provided he paid one-half the taxes and water rents upon the entire property.

The chancellor observed that the property was either a gift from appellant to appellee or was held by appellee in trust for appellant; that if it were a gift, the bill must be dismissed, and the same result must follow even if it were found to be held in trust, because appellant had

made the deed of conveyance for the purpose of defrauding his wife of her rights in the property. It is impossible to ascertain, from a consideration of the opinion and the decree, whether the latter in fact rested upon the finding that it was a gift, or that the conveyance was made by appellant to defraud his wife of her rights in the property.

Before considering those contentions in the order named, we will first state the undisputed facts and next proceed to discuss the testimony offered by the parties to support their respective contentions.

Lillie E. Kelley is the second wife of appellant, and their marital differences had become so acute that on January 28th, 1937, they entered into an agreement to the effect that they intended in the future to live separate and apart. Under that agreement the husband paid the wife $1750 in cash and gave her a confessed judgment for $250, with a stay of execution for two years. Mrs. Kelley, in turn, in consideration of those payments, renounced all rights of dower or otherwise that she had in any real estate that her husband then owned or might subsequently acquire. The agreement was duly recorded among the Land Records of Allegany County. Appellant then owned a double brick dwelling on Pennsylvania Avenue, and fearing, after consulting his counsel, that the wife might in some manner, despite her agreement with him, later claim an interest in the property, joined with her on the same date in executing a deed for it to one Mina Montgomery, trustee (Miss Montgomery being secretary to his counsel). By the terms of that instrument the trustee was "To Have and To Hold the above granted property unto the said Mina Montgomery, Trustee, for the purpose of re-conveying the property aforesaid unto the said Eugene A. Kelley, to his sole and separate use as if he were an unmarried man with the right to him to hold and convey the property aforesaid without the joinder of his wife, Lillie E. Kelley in any deed of conveyance, or to convey direct the aforesaid property to any one the said Eugene A. Kelley may des-

ignate." The property was then encumbered by a mortgage in favor of Mary Clark Roman for $3,500 in addition to certain accrued interest, a part of that money having been used by appellant to make settlement with his estranged wife. Subsequently, on February 19th in the same year, at the direction of appellant, Miss Montgomery, the trustee, executed the deed conveying the property as an entirety unto appellee, the deed on its face being entirely regular and without any reservations, restrictions or conditions in favor of appellant. The grantee paid the costs incident to the transfer and had the deed recorded. She further, in accordance with the request of her uncle, borrowed from First Federal Savings & Loan Association of Cumberland the sum of $3,500, and secured the loan by a first mortgage upon the property described in the deed, using the proceeds of the loan to apply upon the amount due on the mortgage held by Mrs. Roman, and was required in addition to advance in excess of $140 to extenguish that loan. In addition, Miss Kelley paid one-half of city, state, and county taxes upon the property, paid the entire insurance premium, and at least one-half of the water rents in addition to some plumbing bills, painting and papering and various minor repairs to the property. One of the houses was rented for thirty-five dollars per month, and this exact sum she had agreed to pay monthly in reduction of interest and principal upon the mortgage held by the Federal Savings & Loan Association, and this amount was paid by her monthly, even when the property was unoccupied.

The deed from Miss Montgomery, Trustee, was executed in the office of appellant's counsel, and there is some dispute as to who were present at that time. It was prepared by the attorney for appellant and executed by the trustee at appellant's direction. His counsel testified that appellant told him that he had every confidence in his niece and wanted it deeded to her, and the niece replied that she did not want any part of the property, and expected the uncle to live in one side and collect the

rents on the other, and we are satisfied from a consideration of the record that, after its execution, appellant delivered the deed to appellee. As might naturally be expected, when his testimony depended solely upon his ability to remember details for a period of almost three years, appellant's counsel was not clear in relating the circumstances under which the deed was executed, for he was not even sure that he had dictated it. He was asked if appellant requested him to insert in the deed a provision that the property was to be reconveyed as soon as his client secured a divorce from his wife, and replied that nothing was said in that regard. This circumstance of itself tends to cast doubt upon the correctness of his understanding as detailed three years later to the effect that the property was to be reconveyed, since it is inconceivable that an attorney of his standing and years of experience would, had such an understanding existed, have permitted his client to execute the deed without incorporating therein such a provision, nor would he in all probability have under the circumstances prepared such an instrument. During his testimony, his counsel was interrogated as to who was present when the deed to Miss Kelley was executed, and he replied, "I think Ethel Walker" (meaning the notary), "and Miss Montgomery" (referring to his secretary). Being further interrogated as to the presence of anyone else, he said: "I don't remember. Maybe Mr. Kelley was" (meaning appellant).

It is further admitted that, after the deed had been executed and delivered to Miss Kelley, appellant, in the presence of his counsel and the latter's secretary, Miss Kelley, and any others who were there, directed the attorney to prepare his last will and testament, by which he devised and bequeathed all his estate to appellee.

Joseph Kelley, a brother of appellee, gave testimony to the effect that the witness, appellant, and appellee visited the law office at appellant's request; that after appellant had acquainted counsel with his desire to execute a deed for the property to appellee, the attorney there-

upon went to the court house to secure data to enable him to prepare the deed and the witness accompanied him in an automobile belonging, as he thought, to the attorney, his sister and uncle waiting in the law office until they returned together, after which they all remained until the deed and will had been prepared and executed; that later he took his uncle home in his own car, and his sister returned to her work. The counsel failed to deny any of the circumstances as detailed by the witness, and the conclusion seems inescapable that Joseph Kelley was in fact present on that occasion, and this conclusion is not weakened because Miss Montgomery, who admittedly was not at all times in the room of her employer, attempted to deny that the attorney went over to the court house to check the land records and undertook to state that only her employer, appellant, and appellee were present when the deed and will were executed.

Eugene A. Kelley testified to the effect that he directed the trustee to execute the deed to his niece upon the understanding with the latter that she would reconvey it to him when he secured an absolute divorce from his wife. But when asked what Miss Kelley had to say about it, he replied, "I don't know." Later he corrected himself, stating that she had agreed to accept the deed upon those terms; that in June, 1939, he got his divorce, but his niece had not reconveyed the property in spite of demands made by him upon her to do so. On cross-examination he was asked if he had not written his niece a number of times and expressed himself in each of those letters as having had the utmost confidence in her, and replied, "I don't know whether I wrote that or not." However, he later replied that it was in fact true. He further testified that he had full confidence in Genevieve down to 1939, felt very close to her and did not want his second wife to get any more of his property. He further admitted that while he was in the Memorial Hospital for observation in January, 1937, he was visited frequently by his nephew, Joseph Kelley, with whom the witness

was still friendly, but denied having told Joseph he desired to convey the property to his (Joseph's) sister, Edith Genevieve. He was asked if he did not remember making arrangements for Genevieve to meet him in his attorney's office on the occasion of the execution of the deed, and answered, "I don't remember the date," but finally admitted having made such an arrangement in January, 1937, for, after first answering "I certainly did," he later said he did not remember and did not know. He was asked if he changed his mind about "Genevieve getting the property," and answered, "I certainly did, yes siree"; that he changed his mind when she refused to convey it to him about two months prior to testifying. He undertook to state that he had paid taxes and water rents for certain years, but, from the receipts produced, it appears that his niece paid more than one-half of those items and all of the insurance.

Appellant was also asked whether, when he sought his niece in regard to having the property reconveyed, if it was not true that he only wanted one-half of the property back. He first answered, "Yes," but later in answering other questions stated that he had asked for a deed for all the property. He then identified a letter written by him to her, dated August 25th, 1939, in which he asked that half of the property be deeded back to him. It is impossible to conclude even from his own testimony that he had ever demanded a reconveyance of more than one of the properties prior to filing the bill of complaint, and this circumstance at least demonstrates that his present attitude is wholly inconsistent with that which he assumed subsequent to the conveyance. Even making allowances for the fact that he is sixty-five years old, his testimony to support his contention that the property was to be reconveyed to him when he had obtained a divorce is at best weak, unreliable, and unconvincing, and these characterizations apply equally to the testimony of his witnesses, whose testimony has already been referred to.

Appellee, in addition to testifying on her own behalf, produced C. Glenn Watson, Joseph Kelley, her brother, Mrs. Mildred Wendell, appellant's second counsel, and Albert Sisler.

The testimony of Watson, who was called merely to state the value of the real estate, need not be considered, but Joseph Kelley, in addition to testifying as to the circumstances attending the execution of the uncle's deed and will, which have been referred to, gave further testimony that the uncle many years previously, even before buying the lot on which the houses were later built, had expressed it as his intention to build upon it, and the property was to go to the witness's two oldest sisters, Regina and Genevieve, the former having died some years prior to the suit; that appellant reaffirmed this intention upon the death of his first wife in 1933, saying he was going to deed it to appellee, and on several occasions he went to the home of the witness and made similar statements, and insisted, after he had made a settlement with the second wife, upon deeding the property to appellee; that while he was in the hospital witness visited him and appellant said that as soon as he got out of the hospital he was going "to deed the place over to her," and instructed the witness to have his sister meet him and the witness at the office of his attorney. The meeting took place with the result that, after the deed was signed, in order to be sure that the sister would get any other property which he might own, he had his will prepared and promptly executed it. He further stated, and this was undenied by appellant, that subsequent to the execution of the deed a Mr. Habig presented appellant with a plumbing bill, and the latter said he could not make the money out of him, because "the property belonged to Genevieve," and they could not attach his railroad pension; further that the first time he had ever heard of any desire on appellant's part to have any of the property reconveyed was about six months prior to the hearing, when he went to the house and requested his sister to convey one-half of it to him, and

the latter told him she had too much invested in it, because it was still heavily mortgaged, and she could not see her way clear to deed half of it back and continue to pay the mortgage; that they went out into the yard and appellant said to the witness, "Put yourself in my place, how would you feel about this thing?"; that he answered by asking him why he wanted it back, and received the reply that appellant was going to get married again and wanted his third wife to have "that side of the house."

Mrs. Mildred Wendell, of Morgantown, West Virginia, gave testimony to the effect that in the summer of 1938 appellant visited her five or six times, staying overnight on each occasion; that he discussed his affairs with her and told her that the property belonged to Genevieve (meaning appellee); that he had given it to her and everything was fixed so that when he died she would get the remainder of whatever he possessed.

Albert Sisler, who lived in one of the houses, is a first cousin to appellant. He testified that quite often Eugene Kelley visited him and had on one occasion told him that he had both willed and deeded his property to appellee and the property belonged to her.

The testimony of appellee was to the effect that her relations with her uncle had been most pleasant and cordial until she refused to deed him a part of the property; that her uncle, even before building upon the property, told her one-half of it was to be given her and the other half to her sister Regina, who subsequently departed this life, and on numerous occasions, in making reference to the property, he would say "your house"; that he stated his desire to keep it in her father's family, and those expressions continued from 1918 until 1937, and from 1933 until his second marriage he talked about it "almost constantly," saying that the property was going to belong to the witness, and while he was in the hospital he told her he wanted to deed the property to her, after getting out; that once when she was visiting him he expressed the opinion that he was not going to be "around

much longer," and wanted her to have the property, and she met him at his lawyer's office in accordance with a request she had received from her brother to that effect. On that occasion she said that her brother Joseph was there, and she, the brother, and uncle talked for half an hour waiting for the attorney's arrival; that the uncle said he wanted to deed her the property, but would like to live in one side of it, and he would keep up expenses on that half. He requested her as soon as possible to pay off the existing mortgage, which she had done by becoming liable upon another mortgage; that his attorney, when learning of the understanding, suggested inserting in the deed a clause to the effect that the uncle was to have the privilege of occupying a part of the property, which suggestion did not meet with the uncle's approval, and he said "No, make it a clear deed"; that the deed was prepared by the attorney, executed by her uncle, who immediately handed it over to her, and he then said that he wanted a will drawn, instructing his counsel to make her "the beneficiary of anything he had left." She further testified that she had always been willing for him to occupy one-half of the house in accordance with his request at the time he made the deed.

We have made liberal reference to the testimony given by witnesses, both for appellant and appellee, and already observed that appellant's witnesses were vague in their memories and uncertain as to events to such an extent as to render unconvincing the versions which they gave. That quality does not pertain to the testimony given by most of appellee's witnesses, whose versions, in many important instances wholly undenied by appellant, tend to suggest and show that at the time Kelley executed the deed to his niece he intended to give her the property therein described. This is further shown, not only by his conduct in signing the deed, containing no reservation whatsoever, but as well as by a preponderance of the evidence that it was his actual intent to give her the property, and that intent is not destroyed because of his reservation of the right to live in a part of the building.

*Howard v. Hobbs,* 125 Md. 636, 94 A. 318; *Farmer v. Loyola College,* 166 Md. 455, 171 A. 361. And the fact that appellant at the time of the execution of the deed to his niece also executed a will, leaving her his entire estate, is corroborative and confirmatory of an intention on his part that the property described in the deed was a gift. *Albert v. Albert,* 74 Md. 526, 22 A. 408, and *First National Bank v. Thomas,* 151 Md. 241, 134 A. 210.

This conclusion is also strengthened by the outstanding fact that at the time the deed was executed as well as prior and subsequent to its execution appellant had a very high regard and affection for his niece.

In 3 *Bogert, Trusts and Trustees,* sec. 472, at page 1460, the author, after stating the general rule that proof in the case of express, resulting, or constructive trusts must be clear and convincing, continues as follows: "These statements reflect judicial caution in accepting oral evidence which is intended to contradict absolute conveyances in deeds and wills and overturn record titles. The Statute of Frauds has no application to the proof of a constructive trust. By the eighth section of the English statute, which is universally in effect in this country, trusts arising 'by the implication or construction of law' may be proved by oral evidence or by documents not signed by the party enabled to declare the trust. This naturally opens the door wide to the attack on record titles and on transfers which on their faces are absolute. The importance of security of titles leads the courts to be very cautious in their acceptance of bills for constructive trusts. * * * "

The rule above announced with regard to the character and degree of proof which must be shown in order to establish the trust is believed to be almost universal and has received the sanction of this court in *Moore v. Layton,* 147 Md. 244, 248, 127 A. 756; *Kozlowska v. Napierkowski,* 165 Md. 620, 628, 170 A. 193; and *Geoghegan v. Smith,* 133 Md. 535, 105 A. 864.

We are unable to find upon the evidence in this record that a trust has been satisfactorily established, but con-

clude that a gift of the property to the niece has been shown. It, therefore, becomes unnecessary to consider whether the transfer by appellant in order, as was contended, to defeat any supposed rights of his wife therein, precludes him from coming into a court of equity with clean hands, since regardless of the answer to that contention his bill must fail.

*Decree affirmed, with costs.*