DOROTHY MARIE LONG *v.* MARY E. HUSEMAN

[No. 136, October Term, 1945.]

496

*Decided May 17, 1946.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*F. DeSales Mudd,* with whom were *Mudd & Mudd* on
the brief, for the appellant.

Submitted on brief by *Joseph D. Weiner* for the ap-
pellee.

Grason, J., delivered the opinion of the Court.

Mary E. Huseman (appellee) filed her amended bill of complaint in the Circuit Court for St. Mary's County, in Equity, against her daughter, Dorothy Marie Long (appellant). It alleges, in substance, the following: That she is an aged widow and resides on a farm with one of her daughters, Mary Ada Lacey, at Hurry, Maryland. The farm had previously been sold at public sale, and she received from the proceeds thereof a total of $3,109.90, which, together with other moneys she had, totaled $4,629.90. During 1944 she went to live with appellant and her husband, who were occupying a home as tenants at Mechanicsville, Maryland. In January, 1944, appellant and her husband contracted to purchase certain unimproved real estate from J. Ernest Bell and T. Webster Bell for the sum of $3,000. Appellee paid $2,900 on account of said land, under an alleged agreement with appellant that title to same would be taken in their respective names, as tenants in common, and that appellant would provide appellee a home as long as she lived. Subsequently the deed to said land was unlawfully and fraudulently taken in the name of appellant, alone. (The deed is exhibited with the bill.) Thereafter a house was built on said land and appellee contributed the sum of $1,729.90 for the construction of said house. That Raphael Long, the husband of appellant had knowledge of the aforesaid agreement and made no objection thereto, but ratified the same. The money the appellee put in the land and in the building of the house thereon was all the money she possessed, and she now is penniless. Appellant, her husband, and appellee moved into the house after it was completed and occupied the same for nearly a year, when the conduct of the appellant and her husband towards the appellee became so intolerable that she could no longer make her home with them in said house, and she was ordered to leave the house, and prevented from getting her meals there. She moved out of the house and returned to the home of her daughter, Mary Ada Lacey, with whom she lived before she went to live with appellant and her husband, and demanded of appellant the return of said sum

of $4,629.90, which was refused. She avers that appellant acted fraudulently and in bad faith and has violated the confidence that she reposed in her, to her detriment, and that she must now depend upon the charity of her children. The Hughesville Saving Bank holds a mortgage on said property in the amount of $1,800. That she has not an adequate remedy at law. She avers the deed to said property should be reformed so as to comply with the agreement and intention of said parties, or the property should be impressed with a trust in the amount of $4,629.90 in favor of appellee, subject to the lien of said mortgagee.

She prays: 1. "That the deed to said property be reformed and place in the names of Mary E. Huseman and Dorothy Marie Long as tenants in common or that the said real estate be impressed with a trust in favor of the plaintiff for the sum of $4,629.90, subject to the lien of the said Hughesville Savings Bank." 2. For general relief.

To this bill appellant demurred and the same was overruled. Thereafter appellant answered the bill, denied all the material allegations thereof and averred that the sum of $4,629.90 was an absolute gift made to her by her mother.

Testimony was taken in the case and the cause submitted. The Chancellor below decreed as follows: "It is thereupon this 29th day of October, 1945, by the Circuit Court for St. Mary's County, Maryland, in Equity, adjudged, ordered and decreed that the defendant, Dorothy Marie Long, pay to the plaintiff, Mary E. Huseman, the sum of four thousand, four hundred and fifty-nine dollars and ninety cents ($4,459.90), representing the sum of money found to be due to the plaintiff by the defendant, Dorothy Marie Long, with interest from date and costs of this cause."

From this decree the appeal in this case was taken.

The court was correct in overruling the demurrer to the amended bill of complaint.

The facts in this case show that Mary E. Huseman, at the time of the happening of the matters involved in this case, was a widow, seventy-five years of age, and the

mother of seven children, all adults. Her husband acquired a farm (evidently subject to a mortgage debt), the title to which stood in his name at the time of his death in 1928. Both of them worked hard and the wife toiled in the field, and they paid for the farm and added thereto from time to time. Her education was limited, she having progressed only to the fourth grade in grammar school. She was a farmer's wife, raised a family of seven children, worked in the field and helped her husband to pay for the farm, which he tilled with her help. She was inexperienced in business, so far as the record shows, never had a bank account, and evidently relied upon her husband to take care of financial matters. After the death of her husband she lived on the farm with her daughter, Mary Ada Lacey, whose husband farmed the home place. In the fall of 1943 she received, as her share of the money from the sale of tobacco raised on the place, $1,350 in cash, and about that time the farm was sold by trustees in an equity proceeding, the purpose of which was to distribute proceeds of the sale amongst those entitled thereto. Mrs. Huseman received from the trustees two checks, one for $2,424.20, representing her interest as widow in the proceeds of the sale, and the other for $685.70, which was an amount that a deceased son would have received, which was audited to her.

Dorothy Marie Long, appellant, is a daughter of Mrs. Huseman. Her husband is Raphael Long. Long and his wife are first cousins, and Raphael's mother is a sister of Mrs. Huseman. The Longs have no children. Both Long and his wife had been previously married. Mrs. Long had no children, but Long had children by his first wife. The Longs lived by themselves in a three-room apartment in a small house owned by Long's mother, in Mechanicsville, St. Mary's County. It consisted of a bedroom, dining room and kitchen. For some time prior to the receipt of the money by Mrs. Huseman, referred to, the Longs desired to acquire a home of their own, although their financial worth seems to have been quite meager. When the farm was sold, Lacey, the son-in-law,

purchased the same. Mrs. Huseman said that the Laceys had a large family and she thought it was better for her to go elsewhere to live. When she received $1,350 for her share of the proceeds of the sale of the tobacco, she handed it to Mrs. Long (Mrs. Long said she gave it to her) who deposited it in the Hughesville Bank. She said that her mother did not go with her when she made the deposit and she took the bank book home and showed it to her mother. Mr. Sullivan was assistant cashier of the Hughesville Savings Bank at the time. He states that the account was opened December 16, 1943, and Mrs. Huseman, Mrs. Long and Mr. Long were present. He opened the account in the name of "Mary E. Huseman, Dorothy Marie Long, joint owners, subject to the order of either of them or the survivor." At that time Mr. and Mrs. Long had a joint savings account at the bank, but appellant did not deposit this money in that account. Sullivan did not get Mrs. Huseman's signature because, he states, they (meaning Long and his wife) told him that "Mrs. Huseman was not able to sign her name." He took, at the time, the signature of Mrs. Long. He states that the account was opened by the authority of Mrs. Huseman, who "wanted Mrs. Long to handle the money for her, look after it." Thereafter there was deposited in this account the two other checks referred to, which Mrs. Huseman received from the proceeds of the sale of the farm. It appears, therefore, that the money deposited by Mrs. Huseman in this account totaled $4,459.90. Mrs. Long deposited $692.63 in this account, which was the sum that she received from the proceeds of the sale of the farm.

On December 29, 1943, the Longs contracted to buy three and nine-tenths acres of land from a Mr. Bell, for $3,000, and on that day they paid Bell $100, which was a sum of money that is said to have been given Long as a Christmas present. Thereafter the balance of $2,900 was paid by check drawn by Mrs. Long on the account opened at the Hughesville Bank and which stood in the names of Mrs. Huseman and Mrs. Long. Mrs. Long said

that her mother did not have a home and that her sister, Mrs. Lacey, did not want her to stay on the farm, of which there is no corroboration at all. Mrs. Huseman moved to the home of a son, but was dissatisfied there and subsequently moved to the small apartment of Mr. and Mrs. Long. Appellant testified: "I did not tell her to leave, I did not tell her to stay; and what she gave me, she absolutely gave me the money, it was mine to do whatever I wanted to do with it. I said, 'Well, we will see about building a home'; I said, 'The place is too small for all of us to live here, it is unhealthy'." She did build a home and she used all of the money deposited in the joint account of herself and her mother at the Hughesville Bank to pay for the ground and to help pay for the building of the home.

When the deed for the land was prepared, at the suggestion of Mr. Bell it was conveyed to Mr. and Mrs. Long, as tenants by the entireties. Appellant said she told Bell that her husband had children by a former marriage, and if she predeceased him they might take as his heirs, in the event of his death. She testified: "My mother gave me that money, she said it was mine, I expect to make a home for her and do for her the rest of my days." Mrs. Huseman stated that she let Mrs. Long have the money that she received from the proceeds of the sale of the tobacco "for my home," and she further stated that the proceeds which she received from the sale of the farm "I let her have that too, for a home. I had no home, and I wanted a home, and I let her have that, to go in my home." She stated that she thought that it was Mrs. Long's suggestion that she deposit the money in their joint names. She further testified, "I expected her to buy a home, we were to buy a home, and I was to be her heir on the deed; and then she was going to have another paper fixed for me, beside that; but the paper never was fixed, and I never was made an heir to the deed either. * * * She told me that I was her heir to the deed." She further testified that Mrs. Long was "to take care of me as long as I lived, to take care of me and do for me." She further testified: "I

thought that I could stay there as long as I lived; she told me if anything happened to her, that I would get half what the place sold for, and Raphael would get the other. That is what she told me." She told this to her mother after she had gotten all of her money. Appellee demanded to be made what she called an heir in the deed, and because of her demand title to the property was taken in the name of appellant.

Nobody saw Mrs. Huseman give Mrs. Long either the cash or the checks. Mrs. Long stated that Mrs. Huseman "walked right out of Mr. Briscoe's office, handed me the checks, put them in my hand and told me it was mine, and it was mine to do whatever I wanted to do with it." Mr. Briscoe, one of the trustees, gave Mrs. Huseman the checks. No one heard this statement and there is no corroboration in the record of Mrs. Long's testimony that Mrs. Huseman gave her either the $1,350 in cash or the two checks which she received from Mr. Briscoe. It was testified that the house erected on this lot acquired from the Bells cost "way over $8,000.00" and that the balance of the money deposited in this joint account was used in the erection of this house. No doubt some money belonging to the Longs was used to build this house, as well as the proceeds of a mortgage which they gave on this property to the Hughesville Savings Bank. After the house was completed the Longs and Mrs. Huseman moved in. She stayed there not quite a year.

An incident occurred concerning a bill which Long told his wife had been paid. She said her mother showed her the bill and learned it had not been paid. At the time, these people were living in the new home. The husband, according to appellee, became enraged. While she was eating, he banged his fist on the table and charged that she broke the lock on his room door. He charged her with snooping around to see what she could see. On another occasion appellee states he told her that if she said another word to appellant while he was at work, when he came back he would "bang my head through that wall, and struck it with his fist." She was asked:

"Q. Why couldn't you stay there? A. The bad treatment that I got, I could not stay.

"Q. What do you mean by bad treatment that you got? A. Oh, my goodness, it was every kind of language used to me that could be used, in the dirtiest kind of way, the worst kind of way; I got threatened and everything."

Appellant says that she and her mother did have little arguments. She accused her mother of eating "some turkey"; that her mother remarked about the untidiness of Long's clothing when he returned from work. The husband gambled a few nights a week and would come in between 1 and 4 o'clock in the morning. The daughter says her mother commented about this and remarked that appellant didn't know whether he was playing cards, and that the husband did not have to be playing cards. In reference to the argument about the bill appellant said: "Oh, yes, well it was not so much; I did not see it, but I think my mother went in his pockets. The argument was about a little bill that was found in his pocket which was supposed to have been paid. He told me that he had spent the money in playing cards, and I thought the bill was paid. My mother went and showed me the bill, and I naturally asked, why didn't he pay the bill, the reason why he didn't, and he did not want to come out and tell me he lost the money in playing cards." The mother denies that she took the bill from the pocket of Long's clothes, or gave it to the daughter. There is no testimony corroborating appellant's version of this matter.

Assuming that the mother had a right to make her home with her daughter and her husband, it presupposed that she would have at least an ordinarily peaceful home. She was an old lady, seventy-five years of age, had stripped herself of every cent she had in the world so that she could have a home and be secure for the remainder of her life, in reasonable peace. While the husband denied he mistreated his mother-in-law, the evidence of the appellant tends to corroborate the testimony of the appellee. He lost money in gambling and thereby failed to pay a bill which he told his wife he had paid. The mother said that

she did not see the bill, the daughter said that she gave it to her. We cannot suppose that appellee made up this story about the bill and of the husband's fury when he learned that his wife had found out that it had not been paid. The testimony of the wife tends to corroborate the mother's testimony regarding this incident. In reference to eating the turkey, we notice that appellant states that "one word brought on another." When one word brings on another, the result is a quarrel. This old lady probably was not accustomed to a husband gambling a few nights a week, and this custom of appellant's husband was somewhat surprising to her. Even if she made some little remark about this matter and even if this old lady was a little difficult, it afforded no occasion for these people to make her life unbearable in the home. And we think the evidence justifies the belief that such was the case. She had, therefore, a right to leave. It would be an unjust thing for this old lady to be forced to leave a home in which she had put so much money, without any redress at all.

Although appellant said that Mrs. Lacey forced the appellee to leave the farm after it was purchased by her husband, it is significant that when the old lady left this home she was taken in by Mrs. Lacey and her husband. The appellant testified that appellee told her that the Laceys forced her to institute the proceedings in this case, but there is not a word of corroboration of this statement in the record.

After the mother left, Mrs. Long went to the farm to see her. She had an argument with her about Christmas cards. It seems that appellant was ever ready to carry on an argument with her aged mother whom she said had given her every cent that she possessed. Her husband says on this occasion the appellee "had fell down and broke her wrist." He further says "they went down in three or four days afterwards and that my wife told her (appellee) that if she wanted to stay away she would pay her so much a month as long as she was away from the home, but when she came back to our house she would not

pay." After these parties moved to the new home appellant stated, "I intended to prepare a paper for Mama that there would be a suitable amount of money given to her for her support the rest of her days, and that in case she got sick, hospital bill, doctor bill, death, or whatever might occur." She never had such a paper prepared. She said the reason that her mother asked for such a paper was for security in case anything happened to her.

"The presumption or inference of a gift ordinarily drawn from a conveyance to a child of land bought by a parent, is weakened in this instance by the fact that so much was conveyed to one child out of eight living." *Quillen v. Bell,* 158 Md. 677, 149 A. 462, 464.

"A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift." *Beard v. Beard,* 185 Md. 178, 44 A. 2d 469, 472.

There is a clear inference from the testimony in this case that the appellant and her husband wanted to buy a home before the appellee received the money from the tobacco crop. Thereafter the farm was sold and the appellee intended to move from the farm. We do not think that the evidence in this case shows that the Laceys forced the appellee to leave the farm. Nobody says so, but the appellant, and this is flatly denied, and it was the Laceys who took the appellee in when she left the new home in the fall of 1944. That appellee wanted a home and security in her old age is clearly shown. The Longs did not have sufficient money to buy or build a home. It was a perfectly natural thing for the Longs to pool their assets with those of the appellee and build a home, where they would live, and where the appellee would have a home for life. The testimony does not warrant a holding that the appellee made a gift to appellant of the money in question. After they moved into the new home contention arose, and as a result thereof appellee left the home. The lot and the erection of the house thereon cost around $8,000. The appellee put in this venture $4,459.90, a mortgage was obtained for $1,800, and the Longs really

put in the property between $1,700 and $1,800. From the testimony in this case, we conclude that the buying of this land and the erecting of the house was pursuant to an agreement between the appellant and her husband and the appellee; that the appellant was to take title and the appellee was to have a home there for the balance of her life, and in carrying out this agreement the appellant stood in a confidential relation to appellee.

We are further of the opinion that the treatment of appellee by the appellant and her husband justified her in leaving that home. We think appellee was capable of conducting the ordinary affairs of life and that she was competent to enter into the transaction. We do not think that this venture was tainted with fraud, committed by appellant or her husband. The appellee knew of the purchase of the property and caused the deed therefor originally prepared to be changed. She knew that the house was being erected and we do not doubt that she knew that the money she received and banked in the joint names of herself and her daughter was being used to pay for the land and to pay for a part of the cost of the erection of the house. And we further think that she must have known of the mortgage executed on the place in order to provide funds to pay for the building of the house. It would not be equitable to deprive the appellant and her husband, under these circumstances, of the money they invested in the home. We are convinced that it was the understanding that the mother, in consideration of the money that she put in the venture, was to have a home for her life in the property. She was forced to leave, by the conduct of her own daughter and her husband.

In *Springer v. Springer,* 144 Md. 465, at 479, 125 A. 162, 168, the court quoted at length, with approval, 26 R. C. L., at page 1,232. We repeat the quotation in part. "Constructive trusts may be divided into three classes: first, trusts that arise from actual fraud; second, trusts that arise from constructive fraud; third, trusts that arise from some equitable principle independent of the existence of any fraud."

"There are other implied trusts, however, which arise by operation of equity. These trusts are known as constructive trusts. They are declared to exist where property has been acquired by fraud or some other improper method, or where the circumstances render it inequitable for the party holding the title to retain it." *O'Connor v. Estevez*, 182 Md. 541, 35 A. 2d 148, 155.

See *Trossbach v. Trossbach*, 185 Md. 47, 42 A. 2d 905, 907.

In this case equity will impress this property with a trust, to the end that the appellee shall be given justice. We hold that the property in question (subject to the mortgage to the Hughesville Savings Bank, of $1,800 and interest accrued or that may in the future become due thereon) is impressed with a trust for the following purposes: a. That appellant shall pay to appellee, dating from January 1, 1945, a sum equal to six per cent. per annum, on the sum of $4,459.90. b. That said sum be paid to appellee by appellant in semi-annual installments. c. That the semi-annual installments that have accrued since January 1, 1945, be paid by appellant to appellee within sixty days from the date of the decree directed by this court to be entered by the chancellor below. d. That in the event of the failure of appellant, her heirs and assigns to pay the semi-annual installments hereby directed within thirty days from date when due, and upon proof of the same, the chancellor below is directed to appoint a trustee (who shall file a bond for faithful performance of the trust reposed in him) to sell the property (subject to the mortgage held by the Hughesville Savings Bank, as aforesaid, and all interest thereon) ; that said trustee shall withhold from the proceeds of such sale an amount not exceeding the sum of $4,459.90, together with all unpaid semi-annual payments aforesaid that have accrued, for and during the life of appellee. e. That in the event said property should be sold at foreclosure under the mortgage held by the Hughesville Savings Bank, or any assignee thereof, for the purpose of collecting the mortgage debt and interest, out of the surplus remaining, if any, after payment

of said mortgage debt and costs, shall be paid to a trustee to be appointed by the court (who shall give bond as aforesaid) an amount not to exceed $4,459.90, together with all accrued semi-annual payments due and unpaid as aforesaid. And the trustee to be appointed by the court under either alternative as aforesaid, shall invest the money he receives, under the jurisdiction of the court, and after payment of proper costs and commission to be allowed to the trustee, pay the balance of the income to the appellee for life; and from and after the death of the appellee the trust shall cease and the *corpus* be paid to the appellant absolutely.

For the reasons given, the decree of the lower court is reversed and cause remanded for proceedings in accordance with this opinion.

*Decree reversed, with costs to appellee; cause remanded for further proceedings in accordance with this opinion.*