## MASTERS *v.* MASTERS ET UX.

[No. 190, October Term, 1951.]

*Decided June 13, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Allan H. Fisher, Jr.,* and *Israel M. Joblin,* with whom was *Samuel J. Fisher* on the brief, for the appellant.

*Ellis Levin* and *Charles J. Levey* for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree declaring the property No. 1814 Forest Park Avenue to be subject to a trust in favor of plaintiffs "to permit them and the survivor of them to use, occupy *and enjoy* the same" for their joint lives and the life of the survivor. [Italicized words not in the prayer of the bill.] Defendant, Jane Masters, is the widow of Elmo L. Masters, son of plaintiffs, Mr. and Mrs. Lee R. [and Verne M.] Masters. For brevity we shall follow the example of counsel by referring to Elmo L. Masters and his wife, defendant-appellant, as Elmo and Jane respectively, and to plaintiffs as plaintiffs or as the father and mother respectively.

Elmo was born on July 7, 1911. On January 1, 1932 he was injured in an automobile accident; as a result he was unable to work for about six months and was in a hospital for several months. His hospital expenses were $617.50, paid originally by his employer, American Stores Company, and refunded to it by his father, his two brothers and himself. A few days after the accident the father obtained employment with American Stores Company at $25 per week, of which $7 a week was deducted toward Elmo's hospital expenses. The two brothers each contributed $100. At this rate the father paid about $182 before Elmo returned to work, leaving about $235 to be paid by Elmo and the father after Elmo returned to work.

Elmo and Jane were married on August 14, 1938. She was then about twenty-six, he about twenty-seven. They were then living with their respective parents. For almost four years they did not announce their marriage. Jane testified, "Neither Elmo or I were earning enough money to live together and make a home, and under

the circumstances we decided to keep our marriage a secret". They both continued to work. Shortly after they were married they bought a shore. "Elmo and I had a kitty, and each week we deposited an equal amount into the kitty until we had enough for a down payment, and we purchased a shore down on the Magothy. * * * I could not say for sure [in whose name the title to that property was held] but I think it was in Elmo's name because of the fact we were married secret. * * * We each had obligations to our parents, Elmo to his and I to mine. * * * That continued throughout. * * * At the time we had the shore paid for we decided that we would sell the shore and use that money towards a down payment for a house, and with that in mind we would put his father and mother in the house so that we would no longer have to contribute to their support. That would be our means of supporting them." They bought the house 1814 Forest Park Avenue. It was conveyed to them as tenants by the entireties by deed dated July 31, 1942. "They [the father and mother] were to live in there rent free and they were to keep the place in some kind of repair. We did not stipulate what they had to do or did not have to do. They were to live there rent free and the repairs would be the rent." Elmo and Jane both continued working. "We shared expenses [of the property] fifty-fifty. * * * When the house was originally in the HOLC—after it was re-financed and put into the Fraternity Building and Loan it was ten something a week,"—$45.75 a month. They had a mortgage on it at that time. Elmo and Jane contributed the money for that purpose. At the time they bought the house they publicily announced their marriage. They did not set up housekeeping. "We did not have that kind of money. We went with my mother and father to board. * * * At that time we were paying $20.00 a week for the two of us." No one else contributed anything towards the purchase price of the house. She does not remember what Elmo's earnings then were, "but they were mighty small". They paid ten per cent down as a deposit, and

the balance was a mortgage with the HOLC; Elmo and Jane made all of these payments to the building association from the time they started to buy the house. Elmo died on February 20, 1951.

The property was bought for $4,300 and some odd dollars. The shore property cost $995 and they sold it for what they had paid for it. Only between $400 and $500 of this went into the new property. The remaining $500 went to buy a used Ford. The mortgage was originally $3,870. When they bought a new automobile in 1950 it was increased $1,500 to $3,900. It is now $3,400 and some odd. Life insurance to guarantee the payment of the mortgage (not increased when the mortgage was increased), $3,089.40, and also $5,000 of other life insurance, were collected by Jane.

For 1942 Elmo and Jane's joint [state] income tax return shows net income, $3,634.83 [apparently, but not certainly, after deduction of the $2,000 exemption]. For 1943 [state or federal ?] her earnings [salary] were $1,569.47. For 1944, joint net income, $5,075.60; 1945, $4,596.40; 1946, $3,871.80 1947 [state], $4,798.49; 1948, $4,771.13; 1949, $3,746.80; 1950, $3,168.41. For 1945 and 1946, Jane's parents, not Elmo's, were listed as dependents, for 1948 and 1949 none. For the years 1948, 1949 and 1950 Jane had not been working.

Elmo's mother testified that she is sixty-seven. "Elmo had gone around and looked at houses, and bought one, and I knew nothing at all of it. And after he bought it he said it was for me, and he wanted me to live there so that it would add fifteen or twenty years to my life so that I could raise all the flowers that I wanted. * * * For three months he tried to get us in. I did not want to take it because several of my friends said they did not think I should." This conversation with Elmo "began about three months before I moved into the house." Elmo had already acquired the property "before he told me". He did not tell her whether he owned it alone or he and his wife. "I am not sure whether I knew [he was married] at that time or not. I know

he said he sold the shore and bought it." He said his mother was to move in there and stay the rest of her life. "He said I did not have anything to do at all except what I wanted to do. He said it was for daddy and me in our old age. * * * I never heard anything about the taxes but I did pay the water bill, the gas bill, the telephone bill, and all repairing, and he told me to go ahead and fix it up just the way I liked because he said, 'Mama you are going to live there as long as you live and you can fix it up the way you want'."

Elmo had an automobile, which he acquired "when he took the last mortgage out on the house", in January, 1950. It was a Nash, brand new. How much he paid for it, his mother does not know. "He had another car to trade in." Whether he paid cash for the car or bought it on payments, she does not know. A few days after Elmo died, Jane came to see his mother about the automobile. "She assured me she was going to do just as Elmo wanted her to do, and I did not want the automobile. All I wanted was what Elmo wanted me to have. * * * The house and the garden. I did not hesitate only that she said I had to sign it, so I signed—* * * A paper to release the automobile." The mother and father both signed. "She told me she was going to do the same as Elmo wanted her to do." Jane knew about this arrangement Elmo had made with his mother and father "from the beginning. (The Court) Why do you say that? A. Well, because Jane once told me that before she and Elmo were married she was going to look out for her parents and he would look out for daddy and me. Her parents bought their house after they were married too. Q. You mean with the help of your son and their daughter? A. Yes, sir." Elmo paid for this property $4,200 or $4,250 in fee. "He was allowed $300 because the cellar was so bad but I paid for the cellar. * * * (The Court) Did you know about Elmo putting a mortgage on the property? A. Not until it was done. * * * (The Court) Tell us something about that, how you came to know about the mortgage? A.

Well, I think he told me that he had put a mortgage on it and other than that—I know I was not pleased. I remember that because I could not see why it should be on our place, but he said everything will be all right. It is not going to interfere in any way whatsoever, and I know he got a new car with it because he told me that he had a right nice car to trade in. (The Court) Was that before he was taken sick? I understand he was quite sick for some time before he died. A. Elmo has carried a terrible high blood pressure I would say for almost two years. He was going to the doctor all the time. He was sick in that way but Elmo did not think he could ever die but Jane told me herself she knew he was going to die a year before he did." She did not know that Elmo had placed the property in the names of himself and Jane, or whether he had paid all cash, or had secured a mortgage when he bought the property.

Elmo's father testified that he is seventy-one. Elmo told him, just before he bought the property, "Dad, I own a shore. I am going to sell it and buy you a home." He did not say where he was going to buy it at that time. In the next conversation, probably a month or two months later, he said "I sold the place and I have bought you a home at 1814 Forest Park Avenue", "I sold the shore for the down payment". "And if I am not mistaken he said, 'I will have to pay $10.00 a week until it is paid out, and that takes care of everything but the water bill'. I said, 'We will take care of the water bill.' * * * He said we were to live there as long as we lived, pay nothing. I said, 'Well, we will pay the taxes anyhow'. He said, 'No, you pay nothing. That is all taken care of in the building association'. He said, 'It is insured, and if anything happens to me why it is paid for'. I believe that is all I knew then. * * * I would say between three and four months" after that they moved into the property. "I talked to [Jane and Elmo both] lots of times and different times [after we moved in] but Jane always told me that that house was bought for us as long as we lived."

Jane, when asked what was the condition of the property at the time it was purchased, said, "Well, to be quite truthful it was filthy". The only thing Jane and Elmo did in the way of repairs was to put in a bucket-a-day water heater, before Elmo's father and mother moved in. The father and mother made the other repairs. Plaintiffs testified that extensive repairs and improvements were made to the property, including the papering and painting of the entire house, exterior as well as interior, the installation of doors, mop boards, and new shutters, the completion of the staircase which was in an unfinished state, the cementing of the cellar, the installation of stationary wash tubs, a gas heater and a "bucket-a-day", the rewiring for electricity of the entire house, the installation of new electrical outlets, lights on the porch and door bells, the installation of a connection with the city sewerage system to replace the cesspool which had been previously used by the occupants of the house, the installation of two hardwood floors and the refinishing of another floor, the cutting of an archway between the library and the parlor, the building of an enclosure for the back porch, the enlargement of one of the bedrooms, the installation of a grape arbor and a rose arbor. The father testified that the cost of these repairs and improvements was "in the neighborhood of $2,500 and $3,000". Judge France suggested possible agreement between counsel as to the amount of expenditures for improvements, and distinction between improvements and repairs, and, if necessary, further testimony after decree. A witness called by appellant testified that the property is now worth $10,500.

Elmo became seriously ill in 1950. He had been ill for several years. He was in the hospital three times in the last six months of his life. Feryl Lee Masters, now twenty-five, a grandson of plaintiffs, whom Elmo's mother "raised from a baby", who was regarded by plaintiffs as their son and regarded them as his parents, lived with them the whole time they occupied the Forest

Park Avenue property. When he was married, his wife Nancy came to live there. When he first started to work after he left school he gave plaintiffs half of what he earned. By the time he was nineteen or twenty he was earning considerably more and started to give them $30 a week. When he was married he gave $45 a week. He and his wife got their food. By January, 1951 Elmo had become unable to keep up payments on the property. Feryl made three payments of $50 each in January, February and March, 1951, the first to Elmo, the second and third to Jane after Elmo's death. In January, 1951, about a month before Elmo's death, a meeting was had at Elmo and Jane's home, between Elmo and Jane, Feryl and his wife and Feryl's lawyer, to arrange some agreement, to be signed by Elmo and Jane, and Feryl and his wife, and no one else, whereby Feryl could make payments of $50 a month to Elmo and would "have the right either to buy the property or have the money repaid interest free". No progress was made at this meeting, as Elmo became quite ill, the meeting adjourned and soon after Elmo went to the hospital for the last time and did not become well enough to discuss the matter. The lawyer, Mr. Caswell Nuger, testified that in the course of the conversation Elmo "made a statement to the effect he wanted this house to be the home for his parents as long as they lived". Feryl testified that if he bought the house Elmo's parents "were to stay there—that is the reason I was to take the house over. Q. [by plaintiffs' counsel] You mean subject to their life interest? A. Certainly." On cross-examination, he testified that "after my grand-parents' death if he [Elmo] sold the house he would repay me out of the house". That particular provision "dealt with the fact that if he was not able to pay me the money and I did not desire to buy the property he would pay me back". It also applied in the event he sold the house "after my grandparents' death". Nancy Masters testified, "Elmo began the discussion—by stating that the property * * * had been bought some years ago

for the purpose of providing a home for his parents in their old age, and also for the purpose of being an investment for himself and his wife. In the course of the discussions he stated that in the event anything should happen to him * * * the mortgage insurance which he carried would clear off—would clear the payments on the mortgage."

Plaintiffs, besides testifying themselves, produced thirteen witnesses who testified to statements made by Elmo at various times or by Jane before or after his death. These thirteen witnesses were: (1) Caswell Nuger and (2) Nancy F. Masters, Feryl's wife, who testified to the statements above mentioned at the meeting in January, 1951 just before Elmo went to the hospital. (3) Feryl Masters, who besides testifying regarding the January, 1951 meeting, testified that before his grandparents moved in Elmo "told Mama and Dad, that is whom I called my grandparents, that he wanted them to have the house, that he had bought it for them to live in the rest of their lives, and on numerous other occasions I have heard him say the same thing". (4) Martin L. Bassford, who testified that on a blackberry picking trip, Elmo, "told me that he had bought this place for his mother and father to live there the rest of their lives", and also "He said 'I wanted to buy my mother and father a home for the rest of their lives, that is what I sold it [the shore property] for'." (5) Mrs. Melva C. Bassford, wife of the witness last mentioned, who testified "that on one occasion, when she, her husband and baby were brought to the home of plaintiffs by Elmo and Jane for the purpose of having their baby's picture take on a bear skin rug belonging to plaintiffs, Elmo stated that 'he had bought this home for his mother and father to live in because the time would come when his father would be pensioned and would not be able to work any longer, and he expected them to live there as long as they lived'," and also "that on another occasion, when Elmo came to her home for the purpose of making out an income tax return 'he spoke

of the house at that time with the same intention that it should be for his parents as long as they lived'." (6) Emmett E. McDonald, who testified that "Elmo stated that 'he had bought it for his mother and dad so they could have a place to live in in their old age'." (7) Mrs. Dorothy McDonald, wife of the witness last mentioned, who testified that "Elmo said that he had bought the house for his father and mother, and they were to live there the rest of their lives'," and also "that, at the time of Elmo's funeral, Jane, 'told me Mr. and Mrs. Masters were to live there the rest of their lives, that is what Elmo wanted'." (8) Mrs. Ole Wood, who testified "that on one occasion Elmo said 'he had bought the home for his mother and father for the rest of their lives and that he wanted his mother to be out there'," and also "that on another occasion, when Elmo was at the Union Memorial Hospital, he said 'he had bought his mother and father a home for as long as they lived, and he hoped that they would always live there as long as they both lived'," and also "that on the occasion when she was present at the funeral home on North and Pennsylvania Avenues at the time of Elmo's death, Jane said she had no one, and she was all alone, and she said she would like to carry out Elmo's wishes regarding the home for Mr. and Mrs. Masters to live there as long as they lived, and she made that statement in front of another witness that is here today." (9) Mrs. Alice Floyd, who testified, "Well, Mrs. Wood was there [at the funeral parlor at the time of Elmo's death] and they were talking, and Jane said she wanted to do just what Elmo wanted to do for his mother and father, and then on another occasion I heard her say * * * not the same day but it was at the time Elmo was at the undertakers, and she told Mrs. Masters that she wanted to do for her and Mr. Masters just what Elmo wanted. Q. Did she say what that was? A. Well, anyone would take it she wanted them to stay in the home. That is what he wanted. She also told her not to be worried because she wanted to do just what Elmo wanted to

do for them". (10) Verne L. Masters, plaintiffs' oldest son, who testified "that Elmo stated that his purpose in buying the property was 'that they were to have a home until they died in the home that he bought' and that they often discussed it, and Mrs. Jane Masters was present several of the times, at least several of them that he discussed it, and she not only acquiesced in it but several times she agreed that was so. Q. What was so? A. That the house was bought for my father and mother until they died." (11) Charles L. Pumphrey, a real estate broker, who was asked by Elmo to look at the property, who testified, "he told me he wanted to buy a piece of property for his parents to live in". (12) Miss Fannie L. Ederr, who testified "that Elmo had said about buying this house in Forest Park Avenue, and he thought how nice it would be for his father and mother, that it would at least add fifteen years to her life." (13) Mrs. Dora A. Shipley, who testified "that she was present at Jane's home on one occasion when Elmo said that he had got the house for his mother, and he said his mother to live in, and that Jane was helping her parents and he was helping his."

In some respects Jane's testimony was in conflict with the testimony of some of these thirteen witnesses. We have not mentioned such parts of her testimony. The lower court having seen and heard all the witnesses, counsel (wisely we think) have refrained from asking us to review the credibility or accuracy of the thirteen witnesses. Assuming their testimony to be true, it is still our responsibility to interpret it.

The contention of plaintiffs, and the decision of the trial judge, is that Elmo's and Jane's statements to plaintiffs—and the "agreement" evidenced thereby—gave rise to a constructive trust on which Elmo and Jane held the legal title to the property for the benefit of plaintiffs for their lives and the life of the survivor. The conflict between this position and Jane's contention is vividly reflected in four questions by the court to Jane and Jane's answers, "(The Court) What was your un-

derstanding with respect to the tenancy of your husband's mother and father? A. They were to live in the house rent free and they were to keep the property up. (The Court) For how long? A. There was never any definite arrangement made. (The Court) Elmo's obligation to take care of his parents continued up to the time of their death, didn't it? A. That is right. (The Court) So that didn't it follow that the understanding would be that they were to stay there as long as they lived? A. I would say as long as Elmo and I could afford to keep them there." The conflict which we must resolve may perhaps be more narrowly stated, viz., whether plaintiffs had any rights in the property—except compensation for improvements—after Elmo's death.

In the bill of complaint and in the oral opinion of Judge France the father's contributions to Elmo's hospital expenses in 1932 and the repairs or improvements made after plaintiffs moved in are, "either or both", regarded as legal consideration for Elmo's—and Jane's—alleged promises. In plaintiffs' brief no mention is made of the hospital expenses. We find no real relation between these expenses and the purchase of the Forest Park Avenue property ten years later or the occupancy of it by the plaintiffs. Plaintiffs, Elmo and Jane and, so far as appears, their respective families, all seem to have had an unusual sense of family responsibilities, legal and moral. Until this litigation arose, they seem to have felt their responsibilities no less than their rights. We do not think that either Elmo or his father considered whether Elmo's "emancipation" had relieved his father of legal responsibility for his hospital expenses when he was twenty years old, or that the father expected, or Elmo—and Jane—intended, a return so out of proportion—in amount, if not in spirit—as a life estate for the parents and the survivor.

The decree "reserves for future determination" the question as to the amount of the lien, if any, to which plaintiffs may be entitled for improvements. In this court Jane concedes the right of plaintiffs to such a

lien; plaintiffs, on the other hand, disclaim any such lien, but rely on the improvements as a consideration supporting their claim to a life estate to them and the survivor. In this position regarding improvements, we think plaintiffs beg the question. When testimony is clear that a man told his son and others that he had bought a farm for the son, had given it to him and intended to deed it to him, the fact that the son was put in possession and made improvements ordinarily made only by an owner, corroborates the testimony and also may constitute a consideration, which makes the gift an oral agreement and takes it out of the Statute of Frauds. *Hardesty v. Richardson*, 44 Md. 617; *Loney v. Loney*, 86 Md. 652, 38 A. 1071. In the instant case, plaintiffs do not claim outright ownership. Justified expectation of indefinite occupation is sufficient to entitle plaintiffs to compensation for improvements. *Chamberlain v. Preston*, 170 Md. 1, 182 A. 579. Whether that expectation was only an expectation of continued bounty, or was based on a constructive trust for Elmo's life, or for plaintiffs' lives and the survivor's, even after Elmo's death, is the question of interpretation before us. Expenditures for improvements, we think, throw no light on this question; they seem equally consistent with either of these three interpretations.

"As with the proof of express and resulting trusts, so in the case of the establishment of constructive trusts, the courts have announced that they require 'clear and convincing' evidence. Other judicial expressions are even stronger in their demands. 'If the evidence is doubtful or capable of reasonable explanation upon a theory other than the existence of the trust, it is not sufficient to support a decree declaring and enforcing the trust.' Sometimes the requirement is stated to be that the facts leading to the decree establishing the constructive trust must be proved 'by greater weight than the mere preponderance of the evidence', or beyond a reasonable doubt. These statements reflect judicial caution in accepting oral evidence which is intended

to contradict absolute conveyances in deeds and wills and overturn record titles. The Statute of Frauds has no application to the proof of a constructive trust. By the eighth section of the English statute, which is universally in effect in this country, trusts arising 'by the implication or construction of law' may be proved by oral evidence or by documents not signed by the party enabled to declare the trust. This naturally opens the door wide to the attack on record titles and on transfers which on their faces are absolute. The importance of security of titles leads the courts to be very cautious in their acceptance of bills for constructive trusts. * * * Cases founded on alleged oral admissions of the defendant are especially weak." 3 *Bogert, Trusts and Trustees,* § 472, pp. 13-15; citing *Gaither v. Gaither,* 3 Md. Ch. 158; *Kelley v. Kelley,* 178 Md. 389, 399, 13 A. 2d 529, quoting part of above quotation. This court has required strict proof of constructive trusts, not only of existence, but also of the terms, of the trust. In *Long v. Huseman,* 186 Md. 495, 47 A. 2d 75, a mother, her daughter and son-in-law pooled their assets to buy a lot and build a dwelling on it, pursuant to an agreement that the daughter was to take title and the mother was to have a home there for the rest of her life. The mother was forced to leave the house by the conduct of the daughter and son-in-law. The lower court decreed that the daughter repay to the mother the amount contributed by the mother. This court agreed with the lower court that the circumstances gave rise to a constructive trust, but reversed the decree for repayment and held the mother entitled only to interest at six per cent on her contribution for life, her contribution at her death thus becoming the absolute property of the daughter. The mother thus lost, through the fault of the others, the consideration for which she made her contribution, viz., a home for life; and got only the income from her contribution for life.

In the instant case what the parties and the thirteen witnesses did not say seems no less significant than what

they did say. Still more significant are the undisputed facts as to the relations between the parties at the time of the acquisition of the property. Elmo was thirty-one, Jane about thirty; his father and mother were sixty-two and fifty-eight respectively. Elmo and Jane owned a shore worth $1,000, and a used car which they turned in, and paid $500, for another used car. They had small incomes and no prospect of increased income. They had kept their marriage secret for four years because they could not afford to set up a home of their own and they recognized their obligations to help their respective parents. They never did have a home of their own. When they announced their marriage they went to board with Jane's parents for $20 a week for both. At that time neither Elmo's age nor his state of health suggested to him that he would die before his parents. He looked forward to their old age, not (so far as appears) after his death, but naturally during the prime of his life. Even during his last illness his mother says he did not expect to die, though Jane did for a year expect him to die.

No witness testified to any statement by Elmo regarding support of his father and mother after his death. The only mention by Elmo of the possibility of his death was his reference to mortgage insurance in his talk with his father before the property was acquired, and at the meeting at his home in January, 1951 as testified to by Feryl's wife, Nancy. Even at that meeting Feryl's testimony shows that Elmo was not contemplating death before his parents. Feryl testified that the agreement was that "after my grandparents' death if he [Elmo] sold the house he would repay me out of the house". If the deed had expressly declared a trust for Elmo's father and mother for their lives and the survivor's, such a trust could not ordinarily be cut down to their lives before his death. But in fact the deed vested the property in Jane at Elmo's death. To contradict the plain effect of the deed, something more is needed than loose talk which did not expressly purport to do so.

Elmo's father and mother had no more reason than Elmo had to expect to "use and occupy" the property, (as prayed in the bill) or "to use, occupy or enjoy it" (under the terms of the decree) after Elmo's death. The father knew it was to be bought subject to a mortgage. Either the father or the mother could have learned, by asking, that it was acquired in Elmo's and Jane's names. The mother knew that the mortgage was increased in 1950 to buy the Nash. Neither had reason to think Elmo and Jane had money to pay for the property in full. The mother says "I know I was not pleased" to learn there was a mortgage "on our place"; she did not say that he had committed a breach of trust, as he undoubtedly did if the decree is correct.

Judge France thinks "the most significant thing in determining whether the parents were tenants at the will of Elmo, or whether they had a life tenancy, using those words broadly", is that "when Elmo was entering on his last illness a month before he died, when he and his wife were not only practically but actually down to their last few dollars", he called this conference, not to sell the property, but to work out some method whereby he could be temporarily relieved of the monthly payments on the mortgage. We cannot take this view of the conference. Elmo had kept his parents on the property for over eight years. He did not want to let them go if he could help it. He did not know "he was entering on his last illness", or that he had only a month to live, or that at his death he and Jane would be reduced to $28. Evidently Jane had not told him. Jane testified that she used the mortgage insurance money to pay hospital bills and other bills. Judge France said, "I feel Jane is subject to absolutely no criticism for using that insurance money for other purposes." This question is not before us. If we shared Judge France's view of the case, viz., that plaintiffs were beneficiaries of a trust for their lives, superior to Jane's legal title, it would seem at least doubtful that plaintiffs

would not be entitled to require Jane to apply the mortgage insurance money to reduction of the mortgage debt.

The matter of the mortgage insurance is one of the several questions involved in the decree but left unanswered. Plaintiffs, like Judge France, felt the inaptness of "life tenancy" to describe the non-technical statements ascribed to Elmo. In their bill they set up a trust "to permit them to use and occupy" the property for life. In the decree the trust is expanded to "use, occupy and enjoy". Does this permit plaintiffs to rent or sell their "life tenancy" or unite in a sale of the fee? Or does their interest terminate if, from ill health or otherwise, they or the survivor becomes unable to occupy the property? If plaintiffs cannot unite in a voluntary sale, then neither plaintiffs nor Jane can realize anything from the property except by a sale under the mortgage. If plaintiffs' "life tenancy" ranks ahead of Jane's interest—as it does under the decision and decree below—two joint-and-survivor "life tenancies" would represent the greater part of the entire value in fee and more than the entire equity over the mortgage. *Wolfe* on *Inheritance Tax Calculations*, (2d Ed.) pp. 35-36. Except that, as between plaintiffs and Jane, plaintiffs' interest is apparently everything and Jane's nothing, the testimony is anything but clear as to just what plaintiffs' interest is.

Whether plaintiffs had any interest that was enforceable against Elmo and Jane during Elmo's life, we need not decide. His mother's acquiescence in the mortgage to buy the Nash strongly indicates that they had no such interest. It would seem that then, and not after Elmo's death, plaintiffs had to choose between continued bounty and claim of right. *Dorsey v. Stone*, 197 Md. 220, 224, 78 A. 2d 757, 759. We think the testimony relied on by plaintiffs falls far short of showing any interest in them superior to Jane's legal title by survivorship. Elmo's alleged statements to plaintiffs were not the language of the law or the market place, but of Santa Slaus or Cinderella's Fairy Godmother.

They did not create legal or equitable rights; they expressed affection and continuing bounty, were made in good faith and with good will, but created no obligations, legal or moral, which survived after they were made impossible by death.

In *Flanagan v. Flanagan,* 133 Md. 332, 105 A. 299, a widow obtained by will from her husband a life interest, with remainder to her two sons, in a leasehold lot. She and one son conveyed their entire interest to the other son. Six years later the grantee died. The mother filed a bill to set aside her deed, on the ground that the real consideration was an oral agreement of the son to support her and furnish her a home for the rest of her life. This court affirmed an order, dismissing the bill on demurrer, on the ground that the son had supported the mother and performed his contract until prevented by death from continuing to do so.

In the instant case Elmo, as long as he lived, made good all his statements (enforceable or not) to his parents. His death made it impossible for him to continued to provide them a home and left Jane without means to do so, however much she might have desired to do so. Neither Elmo nor Jane ever belonged to the small wealthy class (now and in 1942 being fast liquidated through taxation) who were able after death to continue to do *per alios,* what they in life had done *per se.*

This case must be remanded for determination of the amount of the lien to which plaintiffs are entitled for moneys expended in improving and enhancing the value of the property. In this determination attention should be given, not unduly to differences between improvements and repairs for accounting purposes, but primarily to enhancement of value. If a property is abnormally out of repair, such "deferred maintenance" may constitute "accrued depreciation" in the value of the property. Expenditures to put such a property in normal repair enhance value no less than expenditures for new improvements to a property already in normal repair. Of course, allowance for recurrent repairs can be made

but once, and then only if the property at the end of plaintiffs' occupancy is in better condition than at the beginning. As Judge France suggested, expenditures for improvements must be reduced by appropriate allowances for subsequent depreciation in the improvements. As this case involves a lien for expenditures, not a sale or a valuation, all computations of expenditures and depreciation must be based on actual cost, without allowance for appreciation in market values—or depreciation in value of the dollar.

Plaintiffs filed a motion to dismiss the appeal for failure to print sufficient testimony in appellant's appendix, viz., the testimony of plaintiffs' thirteen witnesses and of their witnesses as to repairs and improvements. In appellant's brief she disclaimed any intention to ask us to review conflicts between her testimony and the testimony of the thirteen witnesses or to review the incomplete testimony regarding repairs and improvements. Plaintiffs in their brief printed fully and concisely, the testimony, mentioned in this opinion, of of the thirteen witnesses and a summary of the father's testimony regarding improvements and repairs. No issue of fact was raised as to any of this testimony, and our decision is based on the assumed truth of all of it for the purposes of this appeal. In the circumstances plaintiffs' selection and printing of this undisputed testimony was the simplest and cheapest way to deal with it, and appellant's printing was sufficient to comply with our rule. *Klein v. Dougherty*, 200 Md. 22, 87 A. 2d 821, and cases cited. The motion to dismiss is therefore overruled.

> *Decree reversed with costs, and cause remanded for further proceedings in accordance with this opinion.*

HENDERSON, J., delivered the following dissenting opinion.

I find no room in the testimony for "interpretation", whereby a condition subsequent can be attached to the

agreement, making it contingent upon the son's survival. There is not a word of testimony to support such a finding. The effect to do equity by an unusual and complicated computation, in order to restore the consideration paid in the shape of a complete restoration of the premises, is a poor substitute for the appellees' loss of their home. Nor does it seem equitable that the appellant should now realize upon the appreciated value of the investment of her husband and herself, when both had repeatedly promised to defer such realization until the death of the improvers. I think the decree of the chancellor should be affirmed.