803 A.2d 548

**FROM THE HEART CHURCH MINISTRIES, INC., et al.**

v.

**AFRICAN METHODIST EPISCOPAL ZION CHURCH, Mid–Atlantic II Episcopal District, et al.**

No. 3, Sept. Term, 2000.

Court of Appeals of Maryland.

July 24, 2002.

Jack Lipson, (Darryl W. Jackson, Laura K. McNally, Jamellah L. Braddock, Stephen E. Jones, Erica Y. Williams of Arnold & Porter, on brief) Washington, DC, (Robert C. Park, Jr., Midgett S. Parker, Jr., Gerald W. Heller and James E. Gilbert of Linowes and Blocher LLP, on brief) Silver Spring, of counsel, (Steven E. Murray, Gloria J. Matthews, Norman D. Romney, Cecilia R. Jones and Malik O. Ellis of From The Heart Church Ministries, Inc., on brief) Temple Hills, for appellants.

James E. Ferguson, II (James E. Ferguson, III of Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., on brief) Charlotte, NC, Thomas R. Kline and (Thomas E. Starnes of Thomas L. McCally and Tina Maiolo of Carr, Goodson and Warner, on brief) Rev. John L. Walker of Landover, for appellees.

Argued Before BELL, C.J., ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

BELL, C.J.

The issue presented in this case involves the ownership of church property after a local church, incorporated under the Maryland Religious Corporations Law, Md.Code (1957, 1999 Replacement Volume) Title 5, Subtitle 3 of the Corporations and Associations Article,[1] but affiliated with a religious denomination, terminates that affiliation. The Circuit Court for Prince George's County determined that the church property

---

\* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Unless otherwise indicated, future references will be to this statute.

belonged to the religious denomination. We issued the writ of certiorari to review the issue. We shall reverse.

## I.

### A.

From The Heart Church Ministries, Inc., one of the appellants ("From The Heart"), was organized in Marlow Heights, Maryland in 1981, as an affiliate of the African Methodist Episcopal Zion Church, one of the appellees[2] ("A.M.E. Zion"). It was organized by Reverend Doctor John A. Cherry, the other appellant, its pastor, to whom A.M.E. Zion had given a Pastor's Certificate of Appointment and whom it had reappointed to that position for every term thereafter until the withdrawal, and the church's 24 members. On May 2, 1983, trustees, who had been elected by the congregation a year earlier, formally incorporated the church under the Maryland Religious Corporations Law, *see* § 5–304,[3] as Full Gospel

---

2. The other appellees are the Philadelphia–Baltimore Annual Conference of the A.M.E. Zion Church and Full Gospel A.M.E. Zion Church. They are included in any future reference to the "appellees" or A.M.E. Zion. Numerous other denominations participated as *amici curiae*, including the United Methodist Church, the Seventh–Day Adventists, Protestant Episcopal, American Baptist, Presbyterian Church, Church of Jesus Christ of Latter–Day Saints, Maryland Catholic Council, Board of Incorporators of A.M.E. Church, C.M.E. Church, and the Worldwide Church of God.

 Full Gospel A.M.E. Zion Church was incorporated under Maryland law after the original Full Gospel A.M.E. Zion Church, the predecessor to From the Heart Ministries, Inc., had changed its name and withdrawn from the A.M.E. Zion denomination. A pastor has been appointed by A.M.E. Zion to replace Rev. Cherry, the founding pastor. Appellee Full Gospel contends that it remains the congregation established in 1981, albeit much reduced in numbers, and continues a member of the A.M.E. Zion Church. For that reason, it maintains that it is "entitled to ensure that the property their contributions helped to acquire remains subject to the congregation's pledge to hold property in trust for the good of the entire denomination."

3. Section 5–304. Articles of incorporation, filing and contents provide
 (a) The trustees shall file articles of incorporation for record with the Department.
 (b) The articles of incorporation shall contain:

A.M.E. Zion Church, Inc.[4] Its purpose, as stated in the Articles of Incorporation ("charter"),[5] was:

> "To conduct a church for Christian religious purposes and to perform all necessary and allowable activities in connection therewith or incidental thereto, and to engage in any other lawful activity in accordance with the Disciplines of the African Methodist Episcopal Zion Church.

> "To do anything permitted by Subtitle 3 of Title 5 of the Corporations and Associations Article of the Annotated Code of Maryland, the Religious Corporations law.[6]"

---

 (1) The plan of the church;
 (2) The address of the principal place of worship of the church; and
 (3) The name and address of the resident agent of the church.
(c) When the Department accepts the articles of incorporation for record, the trustees become a body corporate under the name stated in the articles. Section 5–302(c) prescribes the contents of the "plan of the church":
 "(1) The purposes for which the religious corporation was formed;
 "(2) The name of the religious corporation and the church;
 "(3) The time and manner of election and succession of trustees; and
 "(4) The exact qualifications of individuals eligible:
 "(i) To vote at elections; and
 "(ii) To be elected to office."

4. Section 5–301 defines "church" as "any church, religious society, or congregation of any sect, order, or denomination."

5. Section 5–302 requires the adult members of a church who form a religious corporation to prepare a plan of the church, to include:
 "(1) The purposes for which the religious corporation is formed;
 "(2) The name of the religious corporation and the church;
 "(3) The time and manner for election and succession of trustees; and
 "(4) The exact qualifications of individuals eligible:
 "(i) To vote at elections; and
 "(ii) To be elected to office."

6. Pursuant to section 5–306 of the Corporations & Associations Article, that means that it had the power, through its trustees, to:
 "(1) have perpetual existence under the name of the religious corporation;
 "(2) purchase, take, or acquire by gift, bequest, or in any other manner and hold any interest in any assets in the State;

Shortly after its incorporation, Full Gospel, on May 13, 1983, purchased "for use in its growing ministry" property located¹ at 5311 St. Barnabas Road in Oxen Hill, Maryland. The deed to that property listed as owner Full Gospel A.M.E. Zion Church, Inc., a Maryland Religious Corporation. Full Gospel subsequently acquired additional, adjacent property, which it also took in its name alone, and, between 1988 and 1999, other real and personal properties, which were similarly titled. None of the deeds to the real properties, nor the documents reflecting ownership of any of the personal proper-ty, moreover, contained a clause creating a trust in favor of, or providing for reversion to, A.M.E. Zion, which did not make any direct financial contribution to the purchase of any of the property.

In 1991, Full Gospel's Board of Trustees adopted church By-laws and amended its Articles of Incorporation.[7] The By-

---

"(3) use, lease, mortgage, sell, or convey the assets in the manner that the trustees consider most conducive to the interest of the religious corporation;

"(4) Generally manage any assets of the religious corporation; and

"(5) Adopt rules and ordinances for conducting their affairs as necessary and convenient to accomplish the purpose of the religious corporation, including:

"(i) Appointing the time and place of a meeting of its members; and

"(ii) Determining the number of members necessary to constitute a quorum.

"(b) The provisions of this section do not authorize any sale, mortgage, or other disposition of any asset of the religious corporation which is held under an instrument prohibiting that sale, mortgage, or other disposition.

"(c) By resolution, the trustees may authorize one or more of their members to:

"(1) Execute any instrument required to be executed by the trust-ees, including any deed, mortgage, or other conveyance of assets which are to be sold, transferred, or encumbered; and

"(2) Attest and affix to the instrument the corporate seal, if any."

7. Section 5–308. Plan or charter amendment

"(a) A religious corporation may amend its plan or charter as provided in this section.

"(b) A majority of the trustees of a religious corporation proposing to amend its plan or charter shall:

laws broadened Full Gospel's purpose, stating that it "is to conduct a church for Christian religious activities," as contrasted with the requirement to act "in accordance with the Discipline of the African Methodist Episcopal Zion Church." Pursuant to the By-laws, moreover, the trustees were vested with full control of Full Gospel's church property. The By-laws provided that, in furtherance of the church's purpose:

"[T]he Corporation may receive property by gift, devise or bequest, invest and reinvest the same and apply the income and principal thereof, as the Board of Trustees may from time to time determine, either directly or through contributions through any charitable organization or organizations, exclusively for religious, charitable, and educational purposes, and engage in any lawful act or activity for which corporations may be organized under the general laws of the State of Maryland.

"In furtherance of its corporate purposes, the Corporation shall have all the general powers enumerated in Section 2–103 of the Maryland General Corporation Law as now in effect or as may hereafter be amended."

The amendment of the Articles of Incorporation deleted all reference to the A.M.E. Zion denomination. In addition to the same broad statement of purpose as in the By-laws, the amended Articles addressed specifically the disposition of church property on the dissolution of the corporation. As amended, the Articles provided:

"(1) Adopt a resolution which declares that the amendment is advisable; and
"(2) Call a meeting of the adult members of the religious corporation to vote on the amendment.
"(c) Ten days written notice of the time, place, and purpose of the meeting shall be given to each adult member of the religious corporation by:
"(1) Delivering it to him in person;
"(2) Leaving it at his residence or usual place of business; or
"(3) mailing it to him at his address as it appears in the record book.
"(d) The proposed amendment shall be approved by the affirmative vote of a majority of the adult members present at the meeting."

"In the event of dissolution or final liquidation of the Corporation, all remaining assets of the Corporation [the church] shall ... be distributed to such organization or organizations organized and operated exclusively for religious, or charitable, or educational purposes as shall at the time qualify as an exempt organization or organizations ... as the Board of Trustees shall determine."

Full Gospel amended its Articles of Incorporation again on June 15, 1998. This amendment adopted the church's present name, From The Heart Ministries, Inc., and provided, consistent with its By-laws, that the church would have all of the general powers of a Maryland corporation, as enumerated in § 2–103 of the Corporations & Associations. Article.[8] The

---

8. That section provides:

"§ 2–103. *General powers*

"Unless otherwise provided by law or its charter, a Maryland corporation has the general powers, whether or not they are set forth in its charter, to:

"(1) Have perpetual existence, although existence may be limited to a specified period if the limitation is stated in a charter provision adopted after May 31, 1908;

"(2) Sue, be sued, complain, and defend in all courts;

"(3) Have, use, alter, or abandon a corporate seal;

"(4) Transact its business, carry on its operations, and exercise the powers granted by this article in any state, territory, district, and possession of the United States and in any foreign country;

"(5) Make contracts and guarantees, incur liabilities, and borrow money;

"(6) Sell, lease, exchange, transfer, convey, mortgage, pledge, and otherwise dispose of any or all of its assets;

"(7) Issue bonds, notes, and other obligations and secure them by mortgage or deed of trust of any or all of its assets;

"(8) Acquire by purchase or in any other manner, and take, receive, own, hold, use, employ, improve, and otherwise deal with any interest in real or personal property, wherever located;

"(9) Purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of and otherwise use and deal in and with stock and other interests in and obligations of other Maryland and foreign corporations, associations, partnerships, and individuals;

"(10) Subject to the limitations provided in this article, acquire any of its own stock, bonds, notes, and other obligations and securities;

"(11) Invest its surplus funds, lend money from time to time in any manner which may be appropriate to enable it to carry on the operations or fulfill the purposes specified in its charter, and take

1998 charter amendment, like the predecessor 1991 amendment did with respect to Full Gospel, also expressly authorized From The Heart to distribute its assets and property, upon dissolution or final liquidation, to such charitable organizations as its Board of Trustees should determine. Moreover, the 1998 amendment gave the Board of Trustees full power to act on behalf of the church and to conduct any business matters of the church, to adopt By-laws for the church, and to amend, or promulgate new, Articles of Incorporation for the church.

## B.

The A.M.E. Zion Church,[9] founded in 1898, is a religious denomination, international in scope, made up of affiliated churches. It's organizational structure is hierarchical, although

and hold real and personal property as security for the payment of funds so invested or loaned;

"(12) Be a promoter, partner, member, associate, or manager of any partnership, joint venture, trust, or other enterprise;

"(13) Make gifts or contributions in cash, other property, or stock or other securities of the corporation to or for the use of:

"(i) The United States, this State, another state of the United States, a territory, possession, or district of the United States, or any institution, agency, or political subdivision of any of them; and

"(ii) Any governmental or other organization, whether inside or outside the United States, for religious, charitable, scientific, civic, public welfare, literary, or educational purposes;

"(14) Elect its officers and appoint its agents, define their duties, determine their compensation, and adopt and carry into effect employee and officer benefit plans;

"(15) Adopt, alter, and repeal bylaws not inconsistent with law or its charter for the regulation and management of its affairs;

"(16) Exercise generally the powers set forth in its charter and those granted by law; and

"(17) Do every other act not inconsistent with law which is appropriate to promote and attain the purposes set forth in its charter."

9. The African Methodist Episcopal Zion Church can trace its roots back to the Methodist Church, which was established in England by John Wesley in 1738. The discriminatory treatment accorded black members of the Methodist Church led Richard Allen, in 1794, to separate from that church and found the African Methodist Episcopal Church. Subsequently, in 1796, James Varick separated from the African Methodist Episcopal Church and founded the African Methodist Episcopal Zion Church.

the church itself characterizes it as "connectional." Under this structure, the affiliated local churches report to one of twelve bishops, who in turn report, quadrennially, every four years, to the General Conference, the governing body of A.M.E. Zion. Comprised of clergy and lay delegates from around the world, the responsibilities of the General Conference include revising the *Book of Discipline of the African Methodist Episcopalian Zion Church,* A.M.E. Zion's governing policies. Between sessions of the General Conference, A.M.E. Zion is governed by its bishops, who also oversee the various Annual Conferences, which meet yearly to address concerns of the clergy and laity located within the various regions into which the administration of the church is divided.

The rules and regulations of the A.M.E. Zion denomination are codified, and published, in its *Book of Discipline of the African Methodist Episcopalian Zion Church.* The *"Book of Discipline"* is published quadrennially. Because they were applicable either when property was purchased or while it was being held prior to From the Heart's disaffiliation, several editions of the *Book of Discipline,* specifically those dating from 1980 through 1996, are relevant to the resolution of the case *sub judice.* Given that the applicable provisions of each of those editions are identical and both parties rely only on the 1996 edition of the Book of Discipline, however, we likewise shall restrict our consideration to that edition.

The 1996 *Book of Discipline* addresses, as did the predecessor and successor editions, the requirement that places held or hereafter acquired by a local church, for the purpose of worship or parsonage, be held in trust for A.M.E. Zion denomination. Paragraph 494 provides:

"All written instruments of conveyance by which premises are held or hereafter acquired, for use as a place of Divine worship for members of the African Methodist Episcopal Zion Church or for other church activities, shall contain the following trust clause:

'In trust, that said premises shall be used, kept, maintained, and disposed of as a place of divine worship for

the use of the ministry and membership of the African Methodist Episcopal Zion Church in America; subject to the discipline, usage and ministerial appointments of said church as from time to time authorized and declared by the General Conference of said church, and the Annual Conference in whose bounds the said premises are situated. This provision is solely for the benefit of the grantee, and the grantor reserve[s] no right or interest in said premises.'"

The same requirement is imposed on the deeds for parsonage property by ¶ 495.1. It provides:

"1. All written instruments by which premises are held or hereafter acquired as a parsonage for the use and occupancy of the ministers of the African Methodist Episcopal Zion Church shall contain [the same trust clause as set out in ¶ 494, creating a trust, solely for the benefit of the grantee, over such parsonage property]."

Under ¶ 493, "[i]t is the duty of the *Pastor and Presiding Elder* to see that our Church Property is deeded according to our Book of Discipline, and duly incorporated in accordance with the laws of the State or the Territory in which it is situated." The *Book of Discipline* also provides for the eventuality that the trust clause is, for one reason or another, omitted from a deed. In ¶ 495.2, it states:

"2. However, the absence of the trust clause stipulated in ¶ 494 and ¶ 495 in deeds and conveyances previously executed, shall in no way exclude a local church from, or relieve it of, its African Methodist Episcopal Zion Church Connectional responsibilities nor shall it absolve a local congregation or board of trustees of its responsibility to the African Methodist Episcopal Zion Church, provided that the intent and desire of the founders and/or the later congregations and board of Trustees is shown by any or all of the following indications: (a) The conveyance of the property to the trustees of the local African Methodist Episcopal Zion Church or any of its predecessors; (b) The use of the name, customs, and policy of the African Methodist Episcopal Zion Church in such a way as to be thus known to the community

as a part of this denomination; (c) The acceptance of the pastorate or ministers appointed by a bishop of the African Methodist Episcopal Zion Church, or employed by the Presiding Elder of the district in which it is located."

In addition, the *Book of Discipline* contains provisions that do not directly require conveyance of church property in trust, but nevertheless have been argued to be relevant to the determination of the ownership of church property upon withdrawal of a local church from the A.M.E. Zion church. Under ¶ 495.3, it is required that property be sold "in conformity with the Discipline." Paragraph 498.1 is to similar effect, providing:

"1. The Trustees shall not in any case whatsoever dispose of Church Property by sale or otherwise without the consent of the majority of the Members in Full Connection, expressed by vote in a meeting called for that purpose, of which due notice has been given. Provided, however, that no congregation, pastor, nor Trustee Board or agent of the congregation shall mortgage or sell *any* property of the A.M.E. Zion Church without confirmation of the Quarterly Conference and written consent of the Bishop of the District or the Annual Conference."

Finally, ¶ 498.2, applicable to the situation where there is no pastor because there is no local congregation, provides:

"2. It is further provided that where there is a Church or circuit, or a Station, without a Pastor, because the membership has withdrawn and scattered and there is no Congregation, and no need for an appointment of a Preacher to this place, that the Conference in which the Church is located may pass a resolution declaring the Church or Circuit, or Station discontinued or abandoned and ordering the sale of the property, and approved by the Bishop; the Bishop of the District shall give a deed to the purchaser for the same., and the proceeds from the sale of said property turned over to the Annual Conference for its disposition."

## C.

Upon being notified by From The Heart that it intended to withdraw from the A.M.E. Zion denomination,[10] the appellee requested From The Heart to turn over, and transfer ownership of, the real and personal church property it had amassed, to it. From The Heart declined to do so and, instead, filed, in the Circuit Court for Prince George's County, an action,[11] seeking, among other things, a declaratory judgment that it was the sole and rightful owner of the real and personal property it had acquired, to quiet title to that real and personal property and preliminary injunctive relief.[12] A.M.E. Zion answered and filed a counterclaim, in which, among other relief, it sought its own declaratory judgment with respect to property ownership.[13] Moving to intervene, appellees Phila-

---

**10.** Section 5–311 addresses the situation when members of a church separate from that church, providing:

"(a) *Separation and new organization.*—Members of a church may separate from the church, form a house of worship, and employ a minister if:

"(1) They are of sufficient number to form a house of worship and maintain a minister; and

"(2) All debts and contracts incurred by them as members of the original church are discharged.

"(b) *New church entitled to benefits of incorporation.*—When incorporated, the new church is entitled to the benefits of this subtitle relating to religious corporations."

It has no relevance to the issue this case presents.

**11.** In addition to A.M.E. Zion, named as defendants were the African Methodist Episcopal Zion Church Mid–Atlantic II Episcopal District and Bishop Milton A. Williams, Sr. Both of the latter defendants moved to dismiss the action. Subsequently, as to them, the Circuit Court for Prince George's County did so, with prejudice.

**12.** In addition to seeking a declaration as to property ownership and to quiet title, the appellants pled, and pursued, claims of Misappropriation of Name. or Likeness, Service Mark Infringement, Unfair Competition, as to which the preliminary injunctive relief was sought. The complaint also alleged claims for Intentional Interference with Economic Relations, Unjust Enrichment, accounting and sought a declaratory judgment as to the right to the "Full Gospel" name.

**13.** The counterclaim also asserted claims for ejectment, detinue, conversion of personal property, breach of fiduciary duty, accounting, and sought a declaratory judgment on the use of the A.M.E. Zion name.

delphia–Baltimore Annual Conference and the newly incorpo-
rated Full Gospel A.M.E. Zion Church, filed a separate action
against the appellants, also seeking, among other relief, de-
claratory judgment with respect to property ownership, which
it moved to consolidate with the pending actions. A.M.E. Zion
later filed a motion to dismiss the declaratory judgment and
quiet title counts of From the Heart's complaint and the
appellants moved to dismiss both A.M.E. Zion's counterclaim
and the separate action.

The Circuit Court granted the motion to intervene and
consolidated the actions. Then, pursuant to Maryland Rule 2–
322(c),[14] it treated the motions to dismiss as motions for
summary judgment.[15] The court concluded that there was no
genuine dispute as to any material fact with regard to the
following:

> "[D]uring its affiliation with the A.M.E. Zion Church, (From
> the Heart) accepted the pastors appointed by the bishops of
> the A.M.E. Zion Church ... used the name, customs and
> polity of the A.M.E. Zion Church in such a way as to be
> known in the community as a part of the A.M.E. Zion

---

**14.** Maryland Rule 2–322(c) provides:

"... [I]f, on a motion to dismiss for failure of the pleading to state a
claim upon which relief can be granted, matters outside the pleading
are presented to and not excluded by the court, the motion shall be
treated as one for summary judgment and disposed of as provided in
Rule 2–501, and all parties shall be given reasonable opportunity to
present all material made pertinent to such a motion by Rule 2–501."

**15.** Maryland Rule 2–501(a) provides:

"(a) *Motion.*—Any party may file at any time a motion for summary
judgment on all or part of an action on the ground that there is no
genuine dispute as to any material fact and that the party is entitled
to judgment as a matter of law. The motion shall be supported by
affidavit if filed before the day on which the adverse party's initial
pleading or motion is filed."
Maryland Rule 2–501(e) provides that:
"[t]he court shall enter judgment in favor of or against the moving
party if the motion and response show that there is no genuine
dispute as to any material fact and that the party in whose favor
judgment is entered is entitled to judgment as a matter of law."

denomination ... [and,] at all material times, [the Discipline] included provisions requiring all local church property to be held in trust for the A.M.E. Zion Church."

Accordingly, it granted summary judgment: in favor of A.M.E. Zion, African Methodist Episcopal Zion Church Mid–Atlantic II Episcopal District and Bishop Milton A. Williams, Sr., as to the declaratory judgment and quiet title counts of the appellants' complaint;[16] in favor of A.M.E. Zion, as to the declaratory judgment, ejectment and detinue counts of its Answer and Counterclaims; and in favor of the Philadelphia–Baltimore Annual Conference and the newly incorporated Full Gospel A.M.E. Zion Church, as to the ejectment and misappropriation/wrongful conversion counts of their separate action. In addition, the court declared

"that, under the neutral principles of property law, all property acquired by From the Heart Church Ministries, Inc. including all property acquired under the name Full Gospel A.M.E. Zion Church, prior to July 8, 1999, is subject to a trust in favor of the A.M.E. Zion Church, as expressed in *The Book of Discipline of the African Methodist Episcopal Zion Church*, which trust has the legal effect of requiring the property to stay within the A.M.E. Zion denomination and preventing From the Heart Church Ministries, Inc., from retaining the property upon its decision to end its affiliation with the A.M.E. Zion Church."

While the appellant's appeal to the Court of Special Appeals was pending in that court, we issued the Writ of Certiorari, on our own motion, to address the important issue of whether, when a local church withdraws from a religious denomination, the property belongs to the local church or to the denomination. *From the Heart v. African Methodist*, 358 Md. 380, 749 A.2d 171 (2000). As already indicated, we shall reverse.

---

**16.** The court had previously dismissed all claims against the Episcopal District and Bishop Williams, thus, removing them from the case. Therefore, it is unclear whether this ruling has any practical effect.

## II.

In this Court, From the Heart argues that summary judgment in favor of A.M.E. Zion was inappropriate. It asserts that A.M.E. Zion, an hierarchical denomination, failed to avail itself of any one of the three methods this Court has held is available to such denominations to maintain control of local church property when the local church withdraws from the affiliation.[17] In particular, From the Heart points out that there is no provision calling for the reversion of the property amassed by the local church in the deeds of the property or A.M.E. Zion's *Book of Discipline* and there is no Maryland statute that so provides for the benefit of the A.M.E. Zion denomination, as there is with regard to the Methodist denomination, for example. *See* §§ 5–321–328 of the Corporations and Associations Article.[18] More specifically, it notes that it

---

**17.** The three methods were enumerated in *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg,* 249 Md. 650, 663, 241 A.2d 691, 699 (1968) as follows:

"1. It may require reverter clauses in the deeds to the property of the local churches.

"2. It may provide in its constitution or by some other authoritative source for the reverting of the local church property to the hierarchical body upon withdrawal by local congregation with an implied consent by the local church to this provision.

"3. It may obtain from the General Assembly an act providing for such a result."

*See also Mt. Olive African Methodist Episcopal Church of Fruitland, Inc. v. Board of Incorporators of African Methodist Episcopal Church, Inc.,* 348 Md. 299, 306 n. 7, 703 A.2d 194, 198 n. 7 (1997).

**18.** Section 5–326 provides:

"All assets owned by any Methodist Church, including any former Methodist Episcopal Church, Methodist Protestant Church, Methodist Episcopal Church, South, the Washington Methodist Conference, or Evangelical United Brethren Church, whether incorporated, unincorporated, or abandoned:

"(1) Shall be held by the trustees of the church in trust for the United Methodist Church; and

"(2) Are subject to the discipline, usage, and ministerial appointments of the United Methodist Church, as from time to time authorized and declared by the general conference of that church."

Section 5–327 is complementary. It provides:

"The absence of a trust clause in any deed or other conveyance executed before June 1, 1953, does not relieve or exclude a local

did not hold its property in trust for A.M.E. Zion and that A.M.E. Zion was aware of that fact, thus consenting to it. From the Heart argues, in any event, that, rather than establishing, by clear and convincing evidence, an intent to create a trust, the evidence proved the opposite, that From the Heart had no intention to hold its property in trust for A.M.E. Zion.[19]

From the Heart further maintains that, even if *Eldership* method two were implicated, and a finding in favor of A.M.E. Zion were possible on the merits, a trial, nevertheless would be required. In that regard, it contends that genuine disputes as to material facts exist with respect to the affirmative defenses of consent, waiver and estoppel and that those disputes can only be resolved at trial. From the Heart also believes that a trial is required with regard to whether From the Heart, in its former existence as Full Gospel, consented to

---

church in any way from its Methodist connectional responsibilities or from the provisions of this part and does not absolve a local congregation or board of trustees of its responsibility to the United Methodist Church, if such an intent of the founders or the later congregations and boards of trustees is indicated by:

"(1) The conveyance of the assets to the trustees of the local church or any of its predecessors;

"(2) The use of the name, customs, and polity of the United Methodist Church in such a way as to be known to the community as part of this denomination; or

"(3) The acceptance of the pastorate of ministers appointed by a bishop of the United Methodist Church or employed by the superintendent of the district in which the local church is located."

19. From the Heart submits that the "trust" provisions, upon which A.M.E. Zion and the trial court relied, "do not even refer or relate to personal property, the court had no legal basis to decide that personal property was intended to be held in trust." The appellees rejoin that the obligation of the trustees, as expressed in the Book of Discipline, is to "take charge of and protect the Church Property with all of its appurtenances in trust for the membership," which necessarily includes personal property. They also rely on ¶ 498.2 (which "secures the Annual Conference's right to assume control over the real estate [of discontinued or abandoned congregations], sell it and retain the proceeds of such sale) and .3 (entitling the Annual Conference to assume the discontinued or abandoned congregation's interest in "any gift, legacy, devise, annuity or other benefit). Given our resolution of the case, we need not, and, so, do not, resolve this issue.

the property provisions in the *Book of Discipline* and with regard to whether, because its interest was not expressed in the proper form, of which A.M.E. Zion was aware, A.M.E. Zion waived its rights to the property or is estopped to rely on the property provisions of the *Book of Discipline.*

Moreover, the appellant, From the Heart, contends that there is a factual dispute concerning whether A.M.E. Zion dealt with From the Heart in an hierarchical manner, noting the evidence that A.M.E. Zion, as reflected in Bishop Foggie's Report to the 1988 Quadrennial Conference, maintained an unconventional relationship with From the Heart, with respect to, among other matters, the manner in which it held its property.[20]

The appellees, of course, see the issue differently. They characterize the principle issue in this case as whether local church property impressed with a trust in favor of the religious denomination with which the local church has affiliated must remain with the denomination when the majority of the membership of the local church withdraws from the denomination. The answer required by application of the neutral principles approach is, yes, they submit, citing and quoting *Brown v. Scott,* 138 Md. 237, 242, 113 A. 727, 730 (1921) ("any number of the members of a church, whether small or great, have the power to join whatever church they may please, however it may be in disregard of the rules and constitution of the church to which they may have formerly belonged, but they cannot by so doing affect the rights of others, nor divert the use of property held in trust for a particular and specified purpose, to another and different purpose or use"). Under

---

**20.** In the Report, Bishop Foggie stated:

"All kinds of misconceptions arose: criticism of the A.M.E., taking in members already Zionites, worship practices not in accordance with Zion's tradition, presumption to hold an International Institute for pastors and leaders, the property was not correctly deeded to the Denomination, etc.

"What those who were misinformed or ill-informed did not know was that Brother Cherry did not move without calling me or coming to Pittsburgh to discuss matters with me."

that approach, it must be determined if the local church property is held in trust for the use of the parent church, the religious denomination.

The appellees dispute that, in order that local church property revert to the religious denomination when the local church withdraws from that denomination, there must be an explicit provision calling for such reversion in the denomination's constitution or other authoritative source. On the contrary, they submit, all that is required is unconditional trust language like that in the *Book of Discipline* in this case. Indeed, the appellees argue that a reverter upon withdrawal rule is not a neutral principle of law.

Summary judgment was appropriately granted in the case *sub judice* based on two facts that the appellants concede, the appellees argue. From the Heart accepted the pastoral appointments each year and it used the A.M.E. Zion name, customs and polity so that it was known in the community as a part of the denomination. The appellees maintain that anyone who joins a religious denomination is bound by all of the rules of that denomination. They assert that From the Heart knew about the trust language and the trust requirement in the A.M.E. Zion *Book of Discipline*. Thus, the appellees maintain, its failure to deed the church property correctly or A.M.E. Zion's failure to enforce the deed requirement does not raise any issue of consent, waiver or estoppel, the terms and structure of the *Book of Discipline* being so clear and plain that once the conditions set out in ¶ 494 and ¶ 495 are satisfied, i.e. acceptance of pastoral appointments and use of the A.M.E. Zion name, customs and polity, awareness that the church doctrine required church property to be held in trust, a trust exists, even when no trust clause is included in the property deeds. In fact, the appellees argue that the only way to avoid the creation of the trust is to make sure that the conditions are not complied with. They conclude, "having prospered by its affiliation with A.M.E. Zion for nearly 20 years, and having participated in the functioning of the denomination throughout, appellants may not now pretend that Full Gospel was exempt from any of A.M.E. Zion's rules."

III.

The issue this case presents is not a new one for this Court, albeit it has never before been presented in this precise context. We most recently addressed it in *Mt. Olive African Methodist Episcopal Church of Fruitland, Inc. v. Board of Incorporators of African Methodist Episcopal Church Inc.,* 348 Md. 299, 703 A.2d 194 (1997). In that case, we framed the question as "whether the trustees and local congregation lost the rights given them by the deed of the property and confirmed by the Religious Corporation Law and the corporate charter, to own, use and control that property, when the pastor, trustees, officers, and a majority of the congregation of the local church withdrew from ... affiliation [with the denomination], hierarchical in form, with which it had been affiliated for more than one hundred years. *Id.* at 301, 703 A.2d at 195. In answering the question, "no," thus reversing the judgment of the Court of Special Appeals, which had reversed the summary judgment entered by the Circuit Court, we set out the appropriate analytical framework:

"it is clear that the resolution of church property disputes demand an analysis that involves the review of all relevant documents and circumstances. Unless the deed to the property clearly provides for the holding of the property in trust for the parent church, it is not enough to consider simply the form of the church government, the constitution or other authoritative sources pertinent to the parent church's claim to the property, consideration must also be given to the Religious Corporations Law, the relations between the parties, and the local church charter. The latter at the very least provides insight into the relations between the parties and may evidence the local church's consent to the form of government and to be bound by provisions in the parent church's constitution or other authoritative sources pertaining to the ownership and control of its property."

*Id.* at 320, 703 A.2d at 204.

In formulating this analytical framework, the Court began with a review of the Maryland precedents, which resulted in a

confirmation of the principles enunciated in *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg,* 249 Md. 650, 663, 241 A.2d 691, 699 (1968) (*Eldership* I) and *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.,* 254 Md. 162, 165, 254 A.2d 162, 165 (1969), *aff'd,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (*Eldership* II). *Eldership I* started with the proposition that it is clear that incorporation under the General Religious Corporations Law applicable to all religious groups results in the trustees and the local congregation having ownership and control of the property of the local church. 249 Md. at 658, 241 A.2d at 696. *See,* to the same effect, *Eldership II,* 254 Md. at 174, 254 A.2d at 169 ("By the nature of the law in regard to the formation of corporations generally, the religious corporation formed under it is controlled by trustees elected by the local membership."). We concluded that, of the "[a]t least three kinds of internal structure, of 'polity' "—congregational, presbyterial, and episcopal—identified in *Eldership I, see* 249 Md. at 662, 241 A.2d at 698, "Maryland law contemplates a congregational form of church government." *Mt. Olive,* 348 Md. at 314, 703 A.2d at 201.

The ownership and control of such corporations need not remain perpetually with the trustees, however. *Id.* at 315, 703 A.2d at 202. That point, we noted, is clearly made by the enumeration in *Eldership I* of three ways an hierarchical denomination may insure its control over local church property, *id.; see also* 249 Md. at 663, 241 A.2d at 699, as well as by the recognition that "the nature, extent, and consequences of an affiliation are . . . matters to be determined by the trustees and the congregation, in conjunction with the denomination or parent church with which the local church chooses to affiliate," ordinarily is a matter of contract. *Mt. Olive,* 348 Md. at 316, 703 A.2d at 202. *See also Eldership I,* 249 Md. at 672, 241 A.2d at 704; *Eldership II,* 254 Md. at 176, 254 A.2d at 170. The "polity" or the form of the church government of the particular denomination, though not controlling, is an important consideration when deciding whether there is a contract

which alters the ownership and control of the property, at least when there is no express language bearing on the subject in the deed conveying the property. *Mt. Olive,* 348 Md. at 317, 703 A.2d at 203, (citing and quoting *Eldership I,* 249 Md. at 662, 241 A.2d at 698).

That the form of church government is not dispositive was illustrated by *Eldership I.* There, although the General Eldership of the Church of God was hierarchal in nature, its constitution did not address the ownership and control of local church property, beyond recommending both that such property be deeded in trust to trustees and the insertion in such deeds of provisions requiring reversion to the appropriate annual eldership upon the church's becoming extinct or failure to remain doctrinally compatible, the local charter of one of the local churches was explicit in its inclusion of a statement that affiliation with a religious denomination would not affect its control and ownership of its property. *Mt. Olive,* 348 Md. at 317–18, 703 A.2d at 203, (citing *Eldership I,* 249 Md. at 665–66, 241 A.2d at 700) To the *Eldership* Court, it was "plain that it was never contemplated that the property of the local churches should be subject to the control of the Eldership." 254 Md. at 170, 254 A.2d at 168.

*Babcock Mem. Presbyterian Church v. Presbytery of Baltimore of the United Presbyterian Church,* 296 Md. 573, 464 A.2d 1008 (1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984) and *Polen v. Cox,* 259 Md. 25, 31–32, 267 A.2d 201, 204–05 (1970), we proffered, "are examples of hierarchal denominations utilizing one of the accepted methods to maintain ownership and control of local church property" and also demonstrate the necessity "that there be provided evidence of the consent of the local church to [the provision on which the denomination's claim is based]," *Mt. Olive,* 348 Md. at 318–19, 703 A.2d at 203–04, which consent may be express or implied. *Id.* at 319, 703 A.2d at 204. In *Babcock,* express consent to a provision in the religious denomination's constitution prohibiting sale, mortgage or encumbrance of local church property without the consent of the Presbytery was supplied by a provision in the charter of the local church stating that

the local church should "forever remain a Presbyterian Church in accordance with the Standards of the Presbyterian Church of the United States" and a by-law affirming the local church affiliation with the United Presbyterian Church of the United States and acknowledging the subordination of the by-laws to the Constitution of the United Presbyterian Church. *Id.* at 318–19, 703 A.2d at 203–04, (citing and quoting *Babcock,* 296 Md. at 580, 577, 579, 464 A.2d at 1012, 1011, 1013).

The minutes of the General Assembly of the parent church which denied "the right of any local church as a whole to withdraw from the General Assembly" provided the basis for parental church control of the local church property in *Polen. Mt. Olive,* 348 Md. at 318, 703 A.2d at 203, (quoting *Polen,* 259 Md. at 34, 267 A.2d at 206). The local church's consent to that provision "was implied and was inferred from the relationship between the parent church and the local congregation." Id. at 319, 703 A.2d at 204, (citing *Polen,* 259 Md. at 36, 267 A.2d at 207).

With this background, we turned to a consideration of the decision of the intermediate appellate court. As indicated, that court reversed the trial court's grant of summary judgment, but on a ground different from that on which the trial court relied. The Circuit Court granted summary judgment on two grounds, the absence of trust language in the deeds to the church property and the failure of the applicable Book of Discipline to provide for the reversion of the property in the event of a withdrawal from the denomination. Although agreeing with the Circuit Court that the deeds supported the retention of the church property by the local church and assuming the correctness of its finding with regard to the Book of Discipline, the Court of Special Appeals reached the opposite conclusion, based on a provision in the local church's certificate of incorporation.[21]

---

21. That provision was:
 "Know all men by these presents,
 "That the members of the African Methodist Episcopal Church situated at Fruitland Wicomico County State of Maryland . . . at the church

This Court, in rejecting the intermediate appellate court's rationalization, noted its satisfaction that the trial court was legally correct. 348 Md. at 323, 703 A.2d at 206. In making that determination, we reviewed the arguments made to the trial court, concluding that "[t]he major thrust ... was that the A.M.E. Discipline ... mandates a result in its favor." *Id.* By confirming the legal correctness of the trial court's ruling, acknowledging that it responded to the arguments presented, rejecting in the process, the contention that a Book of Discipline containing trust language was applicable, we impliedly rejected the A.M.E. Church's reliance on church doctrine to the exclusion of the evidence derived from an inspection of the relevant documents along with the applicable Book of Discipline. *Id.* at 323–26, 703 A.2d at 206–07. What we said with respect to the office of the local church charter is consistent with such a rejection and, therefore, instructive on the issue this case presents:

"The charter is, on the one hand, a relevant document which must be considered when there is a question raised as to the adequacy of the proof that the parent church has acted, consistent with its form of church government, to maintain ownership or control over local church property and, therefore, the local congregation's consent to the parent church's

building known as Mount Olive on the thirteenth day of April Eighteen hundred and ninety four ... then and there resolved to organize and constitute themselves as a body politic or corporate and for that purpose elected Ebin Stanford, William Cornish, William Cottman, Nathaniel Stanford, S.C. Bulter and Ephraim Banks as Trustees in the name and on behalf of the said Mount Olive African Methodist Episcopal Church and congregation under the provisions of the Public General laws of Maryland and at the said meeting adopted the following regulations, to Wit:

* * * * * *

"4. The name of this Corporation shall be Mount Olive African Methodist Episcopal Church of Fruitland and the Congregation Mount Olive.

"5. The power and authority of said Trustees shall be in subjection to the discipline of said church and the property held by them in trust for the use of the ministry and membership of said church as a place of worship and as a parsonage or dwelling house for the preacher subject to the ministerial appointment of the proper authorities in said church."

hegemony in that regard must be shown. Where, on the other hand, there is no evidence of the parent church having so acted, its constitution and other authoritative documents being silent on the critical issue, the deed to the property lacking any indication of its interest, and there being no legislation to bridge the gap, the relevance of the charter is at best marginal. In that circumstance, where the only evidence is essentially the form of church government, which as we have seen is hardly dispositive, without more, nothing less than the clearest statement of intention that the parent church own and control property deeded to the local church, which also paid for it, will suffice. The office of the charter, in short, ordinarily, is to provide evidence of the local church's consent to be bound by the parent church's polity."

348 Md. at 326 n. 14, 703 A.2d at 207 n. 14.

 As in *Mt. Olive,* the issue is the ownership of the church property acquired by From the Heart during its affiliation with A.M. E. Zion. More specifically, it is whether, because the case was decided on summary judgment, there is in the record evidence, of which there is no genuine dispute, *see* Maryland Rule 2–501(a), that the church property was impressed with a trust, express or implied, in favor of A.M.E. Zion, as and when From the Heart acquired it. This issue must be resolved without determining ecclesiastical questions, *Mt. Olive,* 348 Md. at 310, 703 A.2d at 199, (citing *Watson v. Jones,* 80 U.S. (13 Wall.) at 729, 20 L.Ed. at 676–77), and by applying "neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. Stated simply, the neutral principles of law approach "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775, 785 (1979)

*Jones v. Wolf,* supra, concerned a property dispute between the local church and the denomination with which it was affiliated. Having examined the property deeds, state statutes, local church charter, the denomination's constitution and Book of Church Order for language of trust in favor of the denomination, and finding none, the Georgia courts held that legal title to the local church property was vested in the local church congregation, concluding that the mere connectional relationship between the local church and the denomination was an insufficient basis upon which to establish property rights in the denomination. The United States Supreme Court approved this "neutral principles of law" approach as an acceptable method of resolving that church property dispute. It cautioned, however, that although the analysis may involve examination of some religious instruments, such as a church constitution, the inquiry must be performed in purely secular terms without relying "on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Id.* at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785.

Thus, neutral principles of law are principles that are "applicable not only to religious bodies, but to public and private lay organizations and to civil governments as well." *Kennedy v. Gray,* 248 Kan. 486, 807 P.2d 670, 676 (1991). *See West v. Belin,* 314 Ark. 40, 858 S.W.2d 97, 101 (1993)(stating "where the controversy involves issues of ownership in church property, the state has an obvious and legitimate interest in providing a forum in which these disputes can be peacefully resolved, so long as the resolution by the court does not involve consideration of any doctrinal matters . . . ."); *Moses v. Diocese of Colorado,* 863 P.2d 310, 320 (Colo.1993)(quoting *Bishop and Diocese of Colorado v. Mote,* 716 P.2d 85, 98)(Colo.1986)(religious corporations are " 'subject to the *principles of the common law* and the practice and procedure applicable to corporations under the general incorporation laws, so far as the same are pertinent.' "); *Holmstrom v. Sir,* 590 N.W.2d 538, 540 (Iowa 1999) (holding that any approach for settling church disputes must involve *no* consideration of

doctrine); *Shirley v. Christian Episcopal Methodist Church,* 748 So.2d 672, 675 (Miss.1999) (neutral principles of law envision use of objective concepts of trust and property law in determining property disputes, applied after a secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, *Books of Discipline* and the like to determine whether any basis for a trust in favor of the general church exists); *Atkins v. Walker,* 284 N.C. 306, 200 S.E.2d 641, 650 (1973) (noting that "these questions must be resolved on the basis of principles of law equally applicable to the use of properties of an unincorporated athletic or social club"); *Park Slope Jewish Ctr. v. Congregation B'Nai Jacob,* 90 N.Y.2d 517, 664 N.Y.S.2d 236, 686 N.E.2d 1330, 1332 (1997)(quoting *First Presbyt. Church v. United Presbyt. Church,* 62 N.Y.2d 110, 476 N.Y.S.2d 86, 464 N.E.2d 454, 460–61, *cert denied* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984)) (applying neutral principles, courts focus on the language of instruments such as deeds and on such factors as "the terms of the local church charter, the State statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property," as long as the courts take "special care to scrutinize the documents in purely secular terms and not to rely on religious precepts in determining whether they indicate that the parties have intended [a particular result]"); *Presbytery of Beaver–Butler of United Presbyterian Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317, 1320–21 (1985) ("All disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to the meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine."); *Serbian Orthodox Church v. Kelemen,* 21 Ohio St.2d 154, 256 N.E.2d 212, 215 (1970).("We look to the ordinary indicia of property rights").

A trust exists where the legal title to property is held by one or more persons, under an equitable obligation to convey, apply, or deal with such property for the benefit of

other persons. *Milholland v. Whalen,* 89 Md. 212, 213–14, 43 A. 43, 43–44 (1899). It is charitable when there "is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." Restatement (Second) of Trusts § 348 at 210 (1959). The creation of a trust depends upon the intention of the settlor. *See Mory v. Michael,* 18 Md. 227, 240–41 (1862). In fact, it is that purpose and intention, rather than the use of any particular term, that determines whether a valid trust has been established. Thus, a trust will not be created where none in fact was contemplated. *See Doty v. Ghinger,* 166 Md. 426, 429, 171 A. 40, 42 (1934).

 Trusts arise by either clear and deliberate language or operation of law. They may be express or implied,[22] a subset of which includes resulting or constructive trusts.[23] *See Springer v. Springer,* 144 Md. 465, 475–76, 125 A. 162, 166–67 (1924). Express trusts are created by the direct and willful acts of the parties, by some writing, or deed, or words expressly evidencing the intention to create a trust. *See*

---

**22.** An implied trust results from the legal implication of the facts and circumstances presumed to evidence the intent of the parties. When an express trust fails, an implied trust usually arises. *Taylor v. Mercantile–Safe Deposit & Trust Co.,* 269 Md. 531, 539, 307 A.2d 670, 674–75 (1973). See *Rector v. Episcopal Church,* 224 Conn. 797, 620 A.2d 1280, 1283 (1993). In that case, the Supreme Court of Connecticut applied the implied trust doctrine to uphold the trial court's finding of a trust in favor of the national denomination. It reasoned:

"[I]in resolving ownership disputes over church property, a civil court must first determine whether an express trust exists, and if it does, the court must enforce its terms. If no express trust is found, the court must determine whether an implicit trust exists in favor of the general church. In conducting this inquiry, the court must examine the polity of the church, in addition to the church constitution and its canons, for language of trust in favor of the general church."

**23.** An essential element of constructive trusts is fraud. *Eisinger Mill & Lumber Co. v. Dillon,* 159 Md. 185, 191, 150 A. 267, 270 (1930). No such allegation has been made in the case sub judice and, so, this category of trusts is not applicable and will not further be considered.

*Levin v. Security Financial Ins. Corp.,* 246 Md. 712, 721, 230 A.2d 93, 98 (1967)(citing *Sieling v. Sieling,* 151 Md. 536, 135 A. 376(1926)); *Sieling v. Sieling,* 151 Md. 536, 548–50, 135 A. 376, 381 (1926). A charitable trust is considered an express trust. Restatement (Second) of Trusts § 349 at 213 (1959); *see Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.,* 56 Ohio St.2d 85, 90, 382 N.E.2d 1155, 1158 (1978); *compare Rosser v. Prem,* 52 Md.App. 367, 377–78, 449 A.2d 461, 467 (1982)(enumerating the elements of a charitable trust: fiduciary relationship; duties of trustees; trust property; manifestation of intention; charitable purpose) *with Waesche v. Rizzuto* 224 Md. 573, 583, 168 A.2d 871, 875 (1961)(creation of an express trust). The purpose of advancing religion is a charitable purpose. Restatement (Second) of Trusts § 371 at 253 (1959), see *Rosser v. Prem,* 52 Md.App. 367, 374, 449 A.2d 461, 465 (1982).

In Maryland, the burden of proof, to be carried by clear and convincing evidence, as to the existence of an express trust is on the party seeking to establish the trust. *See Kelley v. Kelley,* 178 Md. 389, 399, 13 A.2d 529, 533 (1940) (an express, resulting or constructive trust must be proven by clear and convincing evidence). *See Masters v. Masters,* 200 Md. 318, 332, 89 A.2d 576, 582 (1952). This Court has recognized that, because it may be one of the consequences of affiliation with a denomination or parent church, matters to be determined by the trustees and the local congregation, the control of the local property may be modified, ordinarily by contract, express or implied, or otherwise. *Mt. Olive,* 348 Md. at 316, 703 A.2d at 202; *Eldership I,* 249 Md. at 672, 241 A.2d at 704; *Eldership II,* 254 Md. at 176, 254 A.2d at 170.

Under Maryland law, the property of a charitable or religious nonprofit corporation is held in trust. *See Inasmuch Gospel Mission, Inc. v. Mercantile Trust Co.,* 184 Md. 231, 239, 40 A.2d 506, 510 (1945). Indeed, the property of a local church is held in trust by the religious nonprofit corporation for the benefit of the local church congregation, *Mt. Olive,* 348 Md. at 314, 703 A.2d at 201, and cases therein cited at n.

10, unless the control of that property is modified by contract, express or implied. *Id* at 316–17, 703 A.2d at 202–03. *See Watson v. Jones*, 80 U.S. at 720, 20 L.Ed. at 673 (holding that "trustees obviously hold possession for the use of the persons who by the constitution, usages and laws of the [church], are entitled to that use"). This is the effect of incorporation under the General Religious Corporation Law, as we made clear in *Eldership I*, in which we concluded:

> "It is clear that when a congregation is incorporated under the General Religious Law applicable to all religious groups, the trustees and the local congregation own and control the property of the local church. . . . There is no provision in the General Religious Law that the local congregation conform to or follow any particular religious tenet or doctrine and it is apparent that it would be inappropriate for the General Assembly to have made such a provision. In short, the General Religious Law is concerned with the ownership, use and disposition of property, not with any religious theories, doctrines or tenets. . . . So far as the Maryland statutory law is concerned, there seems little doubt that the trustees and congregations of the local churches are entitled to own, use and control the property of the respective corporations."

249 Md. at 658, 241 A.2d at 696 (footnotes omitted).

 Once established, a trust may be modified without the beneficiaries' consent, but only if the power to do so is reserved. *Milholland*, 89 Md. at 215, 43 A. at 44. If no such right has been reserved, then the beneficiaries' consent is required before the trust may be modified. *See Allen v. Safe Deposit & Trust Co.*, 177 Md. 26, 29, 7 A.2d 180, 181 (1939). A trust may be designated as either revocable or irrevocable, *See Hoffa v. Hough*, 181 Md. 472, 475, 30 A.2d 761, 762 (1943); in the absence of a designation, the trust is revocable by any act sufficient to manifest the settlor's intention to revoke the trust. *Id.*

 We now turn to apply the foregoing principles to the case *sub judice*. As we have seen, A.M.E. Zion is hierarchal in its internal government structure. It also provides in its

governing documents, the *Book of Discipline* in effect at all times relevant to the case *sub judice,* a trust clause that requires places held, or thereafter acquired by a local church, for the purpose of worship or parsonage, to be held in trust for the denomination. The *Book of Discipline* further provides that this requirement applies whether, or not, the deed or other written instrument by which the premises are held contains the trust clause prescribed in the *Book of Discipline,* so long as "any or all" of certain enumerated occurrences are shown. Insofar as the property acquired by From the Heart is concerned, it is undisputed that these indications existed and have been shown: the property was conveyed to the trustees for From the Heart, From the Heart, as Full Gospel, used the name, customs, and polity of A.M.E. Zion and was known in the community as a member of the congregation of the denomination and From the Heart, as Full Gospel, accepted the pastor appointed by a Bishop of A.M.E. Zion.

It is also undisputed that the property acquired by From the Heart while a member of A.M.E. Zion was titled in its name, as a Maryland Religious Corporation, with no mention of A.M.E. Zion. None of the deeds to the property contained language indicating that the property was being held in trust for A.M.E. Zion. Moreover, From the Heart's Articles of Incorporation do not mention A.M.E. Zion and, in fact, vests its trustees with broad power to act, consistent with the General Corporation law. To be sure, the initial charter, by stating as part of its purpose, "to engage in any other lawful activity in accordance with the Discipline of the African Methodist Episcopal Zion Church," acknowledged From the Heart's affiliation with A.M.E. Zion. As it was permitted by § 5–308 to do, however, From the Heart amended its charter to delete that reference and to expand its corporate powers, both consistent with the General Corporation law provisions. In addition, the church by-laws do not mention or contain any reference to A.M.E. Zion.

Under *Mt. Olive,* consistent with the *Eldership* cases, a court faced with a church property dispute must

review all relevant documents and circumstances, to include the denomination's polity, its constitution and other authoritative sources, the Religious Corporations law, the relations between the parties, the local church's charter and other pertinent documents to determine the proper resolution. 348 Md. at 320, 703 A.2d at 204. Indeed, we made clear, unless the deed to the property contains a trust provision in favor of the denomination, review solely of the doctrine and polity of the denomination simply is not sufficient. *Id.*

In entering summary judgment in favor of A.M.E. Zion, the trial court noted the existence of the factors enumerated in the Book of Discipline as indicating the acceptance of the denomination's polity and its requirement as to the holding of church property in trust and entered the judgment on the denomination's behalf on that basis. Because those factors apply only when there is no provision in the local church's deeds directing that the property is being held in trust for A.M.E. Zion and the record does not reflect consideration of any other documents or circumstances, it appears that the court failed to comply with *Mt. Olive.* For that reason alone, summary judgment should not have been granted.

*Mt. Olive,* as indicated, requires that *all* relevant documents and circumstances must be reviewed. To be sure, the trial court considered that From the Heart, as Full Gospel, complied with the enumerated actions in the Discipline that purport to indicate From the Heart's agreement, as Full Gospel, to the establishment of a trust even though it did not include in the deeds to the property it acquired the trust language specified in the Discipline. The trial court, however, did not consider the contrary evidence, i.e., From the Heart's intentional deeding of the property in its name only, not in trust, the national denomination's acknowledgment of, and acquiescence in, this deeding irregularity, From the Heart's amendment of its charter to remove any reference to the A.M.E. Zion church and to vest its trustees with even greater authority to control the property of the church, evidence that may be construed to suggest that From the Heart did not, in fact, consent to the trust provisions. In effect, therefore, the trial

court considered only the church polity, from which it determined that From the Heart consented to abide by the A.M.E. Zion Discipline. By so doing, and, thus, failing to consider all of the relevant documents and circumstances, the trial court simply and inappropriately has deferred to the church doctrine; it has relied on religious precepts to enforce From the Heart's "Connectional responsibilities."

The Supreme Court, *see Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665, *Watson,* 80 U.S. at 727, 20 L.Ed. at 676, as has this Court, *Mt. Olive,* 348 Md. at 309–312, 703 A.2d at 199–200, and those of our sister States that have addressed the issue, e.g., *West v. Belin,* 858 S.W.2d at 101; *Holmstrom v. Sir,* 590 N.W.2d at 540, have made clear that not only are civil courts prohibited from deciding religious disputes, but that they must refrain from resolving property disputes on a doctrinal basis. In fact, as we have seen, this Court has instructed that where there is no clear provision in the deed to local church property calling for the holding of the property in trust for the parent church, "it is not enough to consider simply the form of the church government, the constitution or other authoritative sources pertinent to the parent church's claim to the property, consideration must also be given to the Religious Corporations Law, the relations between the parties and the local church charter." *Mt. Olive,* 348 Md. at 320, 703 A.2d at 204. This is consistent with what the Supreme Court said in *Jones v. Wolf,* supra,

> "In undertaking an examination of religious documents, such as a church constitution, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust."

443 U.S. at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785. *See also Swanson v. Roman Catholic Bishop,* 692 A.2d 441, 445 n. 7 (Me.1997) (When applying neutral principles of law to resolve church-related disputes, courts may examine church docu-

ments when they can be scrutinized in "purely secular terms" and the court is not required to rely on religious precepts in determining the question before it). Moreover, allowing consent to be found from examination of the church Discipline alone, with no consideration of the other documents and circumstances is not simply to disregard *Mt. Olive,* but it comes quite close to, if it does not do so, violating the First Amendment's prohibition against resolving "rights to the use and control of church property on the basis of a judicial determination that one group of claimants has adhered faithfully to the fundamental faiths, doctrines and practices of the church prior to the schism, while the other group of claimants has departed substantially therefrom. Pressed to its logical conclusion, such a judicial inquiry becomes a heresy trial. Such trials may not properly be conducted by any civil court, state or Federal." *Atkins v. Walker,* 200 S.E.2d at 649.

*Presbytery of Beaver–Butler of United Presbyterian Church v. Middlesex Presbyterian Church,* is relevant on this issue. In that case, by corporate charter amendment, an affiliated church of the United Presbyterian Church of the United States of America (UPCUSA) voted to disaffiliate. It defended an action by UPCUSA for ownership of the church property by contending that they never agreed to surrender title to the national denomination. Reversing the judgment of the Commonwealth Court, which rejected the defense, the Supreme Court of Pennsylvania explained:

"The Commonwealth Court chose to accept that the question was one of deference and yielded the issue to the judicature of UPCUSA. We believe, under the circumstances, they went further than required. Indeed they seemed to have mandated deference simply because there existed a judicature in the national church body. They would have been correct if the issue was doctrinal, it however is, whether there ever existed an agreement at all: an issue that requires no doctrinal exegesis."

489 A.2d at 1322.

The argument that the A.M.E. Zion makes, that where the Church Discipline contains trust language and provides for the

situation in which the local church fails to deed the local church property in trust to the national denomination, the court need resort only to the church Discipline to resolve the property dispute was also made in *Mt. Olive,* and rejected. Only when there is clear trust/reverter language in the deed to the property (Eldership option I), or a statute enacted by the Legislature (Eldership option III), is there no need to consider other documentation. When, however, Eldership option II is at issue, it is necessary to consider other documentation or circumstances to determine whether the local church has consented to the provision in the Discipline providing for the reversion of that property. Indeed, we have indicated that "[t]he office of the charter ... ordinarily, is to provide evidence of the local church's consent to be bound by the parent church's polity." *Mt. Olive,* 348 Md. at 326 n. 14, 703 A.2d at 207 n. 14.

In any event, in Maryland, unless otherwise specifically provided, a trust is revocable. *See Hoffa v. Hough,* 181 Md. 472, 30 A.2d 761 (1943) (holding that a settlor creating a trust may designate it to be either revocable or irrevocable, and if no designation is made, the trust is then revocable, by any act sufficient to manifest the settlor's intention to revoke the trust). Thus, as circumstances and situations change, a trust may be revoked. Paragraphs 494 and 495. 1 of the Book of Discipline provide for a trust in favor of A.M.E. Zion as to premises "held or hereafter acquired" for use and occupancy of a place of worship or a parsonage for the use of its ministers. These provisions apply, clearly, to the situation when the local church is affiliated with the denomination. Neither indicates that the trust thus created is irrevocable nor that it addresses the situation in which, as occurred here, the local church terminates the affiliation. There is no express provision dealing with the disposition of church property when a local church dis-affiliates from the denomination and certainly there is not an express provision mandating that such church relinquish its property upon that occurrence. Consent to holding property in trust during the course of affiliation does not automatically constitute consent to relinquishing that

property once the affiliation terminates. This is particularly the case where the trust is revocable and is, therefore, another reason that there must be a more expanded review of documents and circumstances, as required by Mt. Olive, rather than merely the review of the church Discipline.

*JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE RESPONDENT.*